552 So.2d 435 (1989)
Floyd GREEN
v.
HODGES STOCK YARD, INC.
No. 88-CA-2395.
Court of Appeal of Louisiana, Fourth Circuit.
October 12, 1989.
Michael J. Begoun, William W. Rosen, Herman, Herman, Katz & Cotlar, New Orleans, for plaintiff-appellee.
C. Ellis Henican, Henican, James & Cleveland, Metairie, for defendant-appellant.
Regel L. Bisso, Hulse, Nelson & Wanek, Brad G. Theard, Young, Richaud, Theard & Myers, New Orleans, for third party defendant-appellant.
Before BARRY, WARD and WILLIAMS, JJ.
BARRY, Judge.
In 1980 Floyd Green leased warehouse space from Hodges Stock Yard, Inc. [Hodges] to store vending machines. In September, 1983 Green discovered that some of the machines were corroded. Green sued Hodges alleging negligent maintenance caused corrosion of vending machines stored on the leased premises. Hodges *436 reconvened for past due rent and third partied Continental Casualty Company as the casualty insurer at the time of the alleged damage. Hodges also claimed Continental repudiated its coverage which caused Hodges legal expenses. Continental third partied Great American Insurance alleging it was Hodges' insurer.
Hodges' motion for a directed verdict was granted. The court ruled in favor of Hodges as reconvenor against Green for $1,700.00 past due rent.[1] The court took no action on the third party demands but stated that all parties' rights were reserved. Green previously appealed the directed verdict which we reversed and remanded. Green v. Hodges Stock Yard, Inc., 508 So.2d 934 (La.App. 4 Cir.1987). After remand Hodges third partied Great American Insurance Company.
After trial on the merits the trial court rendered judgment in favor of Hodges on Green's claim, in favor of Great American Insurance and against Hodges dismissing its third party claim for defense costs, and dismissing with prejudice all other third party demands. Green appeals the judgment against him on his principal demand against Hodges. Hodges appeals the dismissal of its third party claims against Great American Insurance and Continental Insurance Companies.

FACTUAL TESTIMONY
Floyd Green testified that he verbally leased storage space for $100.00 per month from Hodges Stock Yards beginning in July or August, 1980. He inspected the area and found no water or leaks. Green stored thirty-one 8-10 year old vending machines and he had the only key to the premises.
In September, 1983 Green went to remove several machines and discovered they were corroded. The worst damage was on machines stored in the rear and which were there the longest. Green cleaned, compounded and repainted the machines, then sold thirty-one machines for $20,000.00. He said that each machine was worth $2,000.
Green contacted a corrosion expert, Reginald Daughdrill, who inspected the premises and found a twelve to fifteen inch hole in the back wall about six to eight inches above the floor. Green felt cold air coming through the hole from about two feet away. On cross-examination he conceded that he went into the storage area thirty or more times from 1980 to 1983, never saw a hole or felt cold air, and did not know when the hole was made. Green's first knowledge of the hole was when Daughdrill located it, but he did not remember whether he told Hodges and never gave Hodges written notice.
Reginald Daughdrill testified that he inspected the premises on February 2, 1984 and found watermarks and corrosion on the five machines he could reach. He took rust scrappings from two and dust and paint from the other three. There was an opening in the roof, but he did not believe water entered Green's area from that source. Daughdrill could feel cold air, he found moisture on the rear floor, and discovered the hole in a wall which separated a cold storage area. He testified that cold air saturated Green's space and caused condensation and ultimately corrosion. He said the cold air could be felt when a person entered the building.
Daughdrill stated the outside temperature on the day of his inspection was 60 degrees with 58% relative humidity. In Green's area it was 49 degrees with 93% relative humidity. A certified copy of the U.S. Department of Commerce records of the local climatological data for the New Orleans area for June, 1983January, 1984 was introduced. Daughdrill said the difference between the inside and outside temperature, especially during the summer, would create a great deal of condensation and corrosion. When asked whether that condition was present prior to December, 1983, he stated there was no way to tell. *437 He could not determine the period of time over which the corrosion occurred.
During questioning by the Court, Daughdrill conceded that he did not measure the temperature, or the volume of air coming through the 1.5 square foot hole in the wall, or the size of Green's storage area. He admitted that he could not state how much the temperature in Green's area was lowered due to air entering through the hole.
After this Court remanded the directed verdict, Francis Schumacher, Hodges' air conditioning and refrigeration mechanic, testified that he made daily inspections of the cold storage areas in the building where Green's machines were stored. He stated that two or three months before Hodges sold the property on December 16, 1983 the Board of Health discovered a hole in an area leased by Charlie Gresham who stored chickens behind Green's space. Schumacher said it was a small hole (the size of his hand) which did not go through the wall and no cold air escaped. Foam was sprayed within a couple of days to close the hole which had been made by Gresham's workmen. He said the Board of Health continued to check regularly. Schumacher had no trouble maintaining the temperature in Gresham's area except once when an expansion valve malfunctioned.
Curtis Lemoine, owner of Southern Coating and Waterproofing, Inc., and others purchased Hodges' building on December 16, 1983. Lemoine testified that he inspected the building prior to the sale, but could not get into Green's locked area. He noted there were holes in the building, but not in the refrigerated sections where he paid the electric bill. He said Green owed back rent, but never complained about a wall hole in his area. Hodges never personally saw any hole in Green's storage area.
Fred Mercier, Lemoine's maintenance man from April, 1984, testified that he first saw a hole in August or September, 1984 after there had been a break-in. Green's space was vacant at that time. Mercier sprayed foam to close the hole.
John Klees, a retired Hodges' employee who took care of the building from 1980, said he did not see a hole in the wall between Green's storage area and the egg storage company until 1987. Only one of Green's machines was in storage at that time. From 1980-1984 he inspected the premises often and said such a hole would have been called to his attention because of its effect on the temperature of the cooler.
Richard Hodges, employed by Hodges in 1980-1983, testified that he went to the building two or three times a year and reviewed the property with the manager. He noted that Charlie Gresham of Imperial Foods occupied a refrigerated area and he checked Gresham's thermostats when he inspected the building. His last visit was several months before the December, 1983 sale. Although he never met Green, he spoke to him ten to twenty times over the years. Green never complained of a hole in the wall. Hodges did see the hole after trial.
Roy Hodges, president of Hodges Bonded Warehouse and other enterprises which included Hodges Stock Yard before a 1987 merger, testified that he inspected the buildings whenever he was in town. Inspections were frequent prior to the December, 1983 sale. He especially went through the Imperial Food Company area to check the cooler. Refrigeration charts were maintained because a constant temperature was part of the lessor's duties. Hodges stated there was no hole prior to Green's 1980 occupancy. He did see the hole after a cold storage tenant moved out and he sold the property. He acknowledged that he brought a part of the wall with the hole to court for the first trial.
Alton Brinkley, an Imperial Foods' employee from 1979-1984, testified there was a hole in the egg cooler wall in 1982 and he could see the vending machines on the other side. He and others attempted to fix the hole, but the filler continually fell out.
The trial court summarized the testimony:
In November, 1980, plaintiff entered into a verbal month-to-month lease with defendant whereby plaintiff would use the enclosed area of a warehouse to store his *438 vending machines. Prior to entering into the lease, plaintiff inspected the premises and made no complaint. During the lease, plaintiff had in his custody the only keys to the leased area, thereby completely controlling access to his storage area.
In September, 1983, plaintiff claimed that he discovered that some of the stored machines had corroded. In December, 1983, the defendant sold the warehouse to another party.
Thereafter, plaintiff continued to occupy the premises. It was not until February, 1984 that plaintiff hired a corrosion expert to inspect the machines and the storage area. Mr. Doughdrill, [sic] the expert, testified that he discovered a hole in the wall at the rear of the storage area. This hole opened into an adjacent refrigerated storage area. It was the expert's opinion and plaintiff's contention, that the corrosion to the machines was caused by water condensation collecting on the machines because of cold air from the refrigerated area entering the warmer non-climate controlled area where the machines were stored.
After reviewing the law, the trial court concluded:
Upon remand, the defense called several credible witnesses, namely Francis Fred Schumacher, Curtis Lemoine, Fred Mercier, John F. Klees, Jr., Richard Hodges, and Roy Hodges. From their testimony and the weight of the evidence the Court concludes that there were no openings in the wall at the time the lease commenced. Even if a hole did exist during the term of the lease, it did not amount to such a defect as to have caused the corrosive damage to plaintiff's vending machines. The machines were all purchased used and were approximately 8 to 12 years old at the time they were placed on the premises. Although the plaintiff noticed heavy rust or corrosion in September, 1983, he failed to notify defendant and made no complaint. He finally called an expert to inspect the area in February, 1984. The Court is of the opinion that plaintiff failed to carry his burden of proof.

GREEN'S APPEAL
Green specifies as error:
(1) Holding that he had to prove that Hodges Stock Yard had the knowledge of the defect or vice in order to hold it liable for defects in the leased premises;
(2) In failing to find that Green established the existence of the hole prior to December 15, 1983;
(3) In not finding that the hole caused the corrosive damage to his vending machines.
Green's first argument was resolved when we reversed the trial court's directed verdict and clearly stated that La.C.C. art. 2695 does not require that the lessor know of the defect, and liability is imposed after the defect is shown to be the cause of the harm. Green v. Hodges Stock Yard, Inc., 508 So.2d 934 (La.App. 4th Cir.1987). The trial court utilized the correct standard on remand.
Green's second and third arguments relate to proof of the existence of the hole prior to December 15, 1983 and causation of the damage.

THE LAW
La.C.C. art. 2695 provides:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
This article governs the lessor's liability to the lessee for damages caused by vices and defects, and places on the landlord the primary obligation to keep the premises in repair. Ivey v. Housing Authority of Mansfield, 514 So.2d 661 (La.App. 2d Cir. 1987).
*439 In order for a lessee to recover damages from the lessor under La.C.C. art. 2695 due to an alleged vice or defect in the leased premises, the lessee must prove by a preponderance of the evidence that a defect existed in the premises and that the defect caused the damages. Latham v. Aetna Casualty and Surety Company, 377 So.2d 350 (La.1979); Broome v. Gauthier, 443 So.2d 1127 (La.App. 4th Cir.1983), writ denied, 445 So.2d 449 (La.1984).
Proof by direct or circumstantial evidence is sufficient to constitute a preponderance if, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Latham, 377 So.2d at 351, quoting Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151, 155 (1971). See also Maryland Casualty Company v. Saunders, 394 So.2d 1256 (La.App. 4th Cir. 1981). Causation may be proved by circumstantial evidence. That evidence need not negate all other possible causes, but it must exclude other reasonable hypotheses with a fair amount of certainty. Buxton v. Allstate Insurance Company, 434 So.2d 605 (La.App. 3rd Cir.1983).

ANALYSIS
As a reviewing court we give great weight to the factual conclusions of the trial court. When there is a conflict in testimony, reasonable evaluations of credibility should not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where "a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, d/b/a Jolly Elevator Corp., et al., 549 So.2d 840, 845 (La.1989).
Reginald Daughdrill found the 1.5 square foot hole on February 2, 1984 during his only inspection. Although he attributed the machines' corrosion to condensation from cold air which escaped through the hole, he conceded that he did not measure the temperature or the volume of air going through the hole. Daughdrill did not know how long the hole existed or how long it took for the corrosion to occur.
Green did not know when the hole developed and was not aware of it (although he was inside the storage area many times) until February, 1984 when Daughdrill discovered it.
The trial court determined there was no hole when the lease commenced in 1980 and evidently concluded that Green did not prove there was a hole during the lease (prior to the December 16, 1983 sale). The court noted the 8-12 year old age of the machines and stated that even if the hole existed during the lease, it did not constitute "such a defect as to have caused the corrosive damage to plaintiff's vending machines." The trial judge held that Green failed to carry his burden of proof.
We find the conflicting testimony inconclusive as to when and how the hole came into existence, and how long the opening lasted. The corrosion expert did not take crucial measurements and did not know how long it would take for the corrosion to occur.
We have no basis to conclude the trial court was clearly wrong or manifestly erroneous.

HODGES STOCK YARD'S APPEAL
Hodges Stock Yard, third party plaintiff, argues that the trial court erred:
(1) In granting judgment in favor of Great American Insurance Company and not requiring the insurer to reimburse it for its reasonable costs, out-of-pocket expenses, and legal fees associated with its defense;
(2) In dismissing, with prejudice, all of the third party demands, including its claim against Continental Casualty Company for costs, expenses and legal fees associated with its defense;
(3) In holding that Great American's offer in its letter to Hodges Stock Yard dated September 5, 1985 did not create a conflict of interest and that Great American had no duty to employ separate counsel to represent Hodges, and was relieved of its responsibility as to costs and *440 fees incurred by Hodges Stock Yard after that date;
(4) In failing to hold that if Green is entitled to any recovery for damages, then Hodges is entitled to a similar judgment against both third party defendants in accordance with the liability insurance policies.
Hodges' first three arguments relate to its reimbursement for expenses and legal fees associated with its defense. Pursuant to a motion by Hodges Stock Yard, Inc., Great American Insurance Company and Continental Casualty Company, on the day of oral argument we granted a joint motion to dismiss Hodges' claim for costs, expenses and legal fees.
Because we affirmed the dismissal of Green's claim, we pretermit discussion as to indemnification.
The judgment in favor of Hodges Stock Yard on Green's claim is affirmed.
AFFIRMED.
NOTES
[1] The judgment on the reconventional demand became final because no appeal was lodged on that claim.