577 So.2d 65 (1990)
The HOME INSURANCE CO. OF ILLINOIS and Beall-Ladymon Corp.
v.
NATIONAL TEA CO., Bogue Falaya Investments, Ltd., and the Covington Volunteer Firemen's Association, Inc.
VIGILANT INSURANCE COMPANY
v.
NATIONAL TEA COMPANY, National Supermarkets, Inc. and/or National Food Stores of Louisiana, Inc., W.H. Reynolds Distributors, Imperial Associated Contractors, Inc., Bolling Oven and Machine Company, John Mykolyk d/b/a J. Mykolyk & Associates, I. William Sizeler d/b/a I. William Sizeler & Associates, James Grogin, the Municipality and City of Covington, Louisiana, the Louisiana State Fire Marshall, and the Covington Volunteer Firemen's Association, Inc., and Nussetex Company and/or Nussex Company.
Nos. 89 CA 1453, 89 CA 1454.
Court of Appeal of Louisiana, First Circuit.
December 18, 1990.
Rehearing Denied February 20, 1991.
Writs Granted May 17, 1991.
*66 *67 *68 Charles Guibault, Beverly Klundt & A. Mark Flake, New Orleans, for Great Southwest Fire Ins. Co.-defendants.
Steven Lozes, H. Alston Johnson, III, New Orleans, for Nat. Tea Co., Twin City Fire Ins. Co.-defendants.
Edward Rice, Jr. and Joseph Gordon, Jr., New Orleans, for Vigilant Ins. Co.-defendant.
Kevin Cole, Metairie, for Home Ins. Co. of Illinois & Beall-Ladymon-plaintiffs.
Michael Vondenstein, Metairie, for Eileen's Expression's Inc. & General Acc. Ins. Co. of America-defendants.
Thomas Mull, Covington, for Shirtz N' Things, Byron Tweedy d/b/a Red Carpets, Clyde Quave d/b/a Covington Sportsman, Inc., Gloria Rodick, wife of/and Elton Van Rodick, d/b/a Soundtrack, Sregit, Inc., d/b/a Video Showplace, Adrianne Achee d/b/a Eileen's Expressions, Inc., Cornelius M. Cousins, d/b/a Bogue Falaya Hairdressers, Alma Fern Willis, wife of/and John T. Willis d/b/a Willis Sales Agency, Inc., Edward Griffin d/b/a Antique, Reproductions, Maryland Cas. Co., First Nat. Bank, Aetna Cas. & Surety Co.-defendants.
Steven M. Lozes, New Orleans, for Nat. Food Stores of La., Inc., & Great Southwest Fire Ins. Co.-defendants.
David Walle, New Orleans, for The Toggery Shop of Covington, Inc. & St. Paul Fire and Marine Ins. Co.-defendants.
Ronald C. Hammock, E. Kelleher Simon, Covington, for Maryland Cas. Co. and Covington Sportsman, Inc.
Roger Broussard, Baton Rouge, for State of La. through the Dept. of Public Safety, Office of State Fire Marshall.
Dale W. Poindexter, New Orleans, for Highlines Const. Co., et al.
Frederick Bott, New Orleans, and Patrick Berrigan, Victor Stilwell, Jr. for August Perez, Jr.
Gary Bezet, Pamela C. Keller, Baton Rouge, for City of Covington, James Grogan, Chief of the Covington Volunteer Fire Dept.
Joseph Tosterud, Jr., Covington, for Shirtz N' Things Covington Inc. (also appellant).
Brad Theard, New Orleans, for Bolling Oven & Mach. Co., Great American Ins. Co. and B.K. Industries.
Arthur Leith & Henri Wolbrett, III, New Orleans, for I. William Sizeler d/b/a I. William Sizeler & Associates & Ins. Co. of North America.
Kristyne McCullough, New Orleans, for W.H. Reynolds Distributors, Inc., Bolling Oven Co. and B.K. Industries.
Steven Caire, Covington, for DOTD.
Timothy Waller, Sr., Metairie.
Marilyn Coehn, Metairie.
Christopher Moody, Hammond, for Covington Volunteer Fireman Ass'n.
Ronald Hand & Jack Blossman, Bogue Falaya Plaza, Covington, for Richard Blossman d/b/a Blossman Leasing, Commercial Plaza, Inc. & Commercial Leasing, Inc., Blossman Interests, St. Tammany Parish, La., F.W. Pierce Bogue Falaya Plaza, Inc. & Richard Blossman, Jr.
*69 Patrick J. Berrigan, Charles, Seemann, Jr., Joseph L. McReynolds, Brian W. Erikson, and Joseph Marcal, New Orleans, for John Mykolyk d/b/a John Mykolyk & Associates.
Joseph Gordon, Jr., Edward J. Rice, Jr., Philip O. Bergeron & Philip A. Becnel, III, New Orleans, for Bogue Falaya Investments, Ltd., Berger & Burrus Investments & Darryl Berger & David Burrus.
J. Paul Demarest & Andrew Davis, New Orleans, for Sregit, Inc. d/b/a Video Showplace, Inc.
Dean Sutherland, New Orleans, for B.K. Industries, Inc., and/or Barbara King, Inc. and Standex Co.
Gordon F. Wilson, Jr., New Orleans.
Rykert Toledano, Jr., Covington.
Before LOTTINGER, SHORTESS and CARTER, JJ.
CARTER, Judge.
These consolidated appeals arise out of several suits for damages resulting from a fire in a shopping mall.

FACTS
In his written reasons for judgment, the trial judge succinctly set forth the facts in the instant case, which are not in serious dispute, as follows:
On the morning of March 11, 1984, a fire destroyed the National Food Store located in one corner of the Bogue Falaya Shopping Center in Covington, Louisiana. Smoke from the fire and the water resulting from the fire-fighting efforts caused damage to a substantial portion of the other stores in the center.
The day began in a normal way. Employees of National arrived to open the store about 7:00 am. Located in the rear of the store was a delicatessen and within the deli was an oven that was used to bake bread and cookies. The oven was turned on that morning by an employee shortly after her arrival and was used to bake some bread.
The initial indication of a problem came at about 9:00 am, when several of the store employees heard a noise that they described as that of glass breaking. They proceeded toward the source of the noise, in the rear area of the store, and noticed a red glow coming from the area immediately above the deli.
In the next few minutes, a number of things occurred. An employee of the store went into the deli area and instantly noticed that pieces of the deli's drop ceiling had fallen to the floor and were burning. These fallen pieces had created a hole in the ceiling directly above the bread proofer that was located next to the oven. The employee attempted to fight the fire by the use of several fire extinguishers in the area but this effort quickly proved to be futile. The fire department was called. The lights in the store went out and the store was evacuated.
The Covington Volunteer Fire Department responded to the fire, as did elements of other area fire departments. The fire was brought under control relatively quickly, with serious damage limited to the deli portion and storage area of the store. By sometime shortly after noon, all or almost all of the fire-fighting units had left the scene and several individuals, including an inspector from the state fire marshall's office, were permitted to enter the store. Within minutes, it became evident that the fire had either rekindled or that a second fire had begun. Burning tar and ceiling tiles began falling onto the shelves near the center of the store.
The store was quickly evacuated again and the fire departments were recalled. This second fire was much more widespread and serious. By the time it was brought under control, the fire had virtually destroyed the National store. Smoke and water damage had affected the majority of the other stores in the center.

PROCEDURAL BACKGROUND
In his written reasons for judgment, the trial judge also set forth the procedural posture of the instant case, as follows:

*70 Numerous law suits were filed by the various tenants of the center whose stores experienced damage and/or their subrogated insurers against the following defendants: (1) National Tea Company, the lessee of the area where the fire started, its primary insurer, Great Southwest Insurance Company, and its excess insurer, Twin City Insurance Company; (2) Bogue Falaya Investments, Ltd., Bogue Falaya Investments, Inc., and Berger and Burrus Investments, the owner of the shopping center, and their insurer, Vigilant Insurance Company (hereinafter referred to as "the center owners"); (3) the Blossman family interests, the previous owners of the center; (4) the City of Covington and Fire Chief James Grogan; (5) the Covington Volunteer Firemen's Association, Inc.; (6) the State of Louisiana, through the Department of Public Safety and Corrections, Office of State Fire Marshall (sic); (7) CLECO, Inc. and its insurer, Highlands Underwriters Insurance Company; (8) Highlines Construction Company and its insurer, National Union Fire Insurance Company; (9) John Mykolyk, Architect; (10) I. William Sizeler, Architect; (11) August Perez, Jr., Architect; (12) Bolling Oven and Machine Company, the manufacturer of the deli oven, and its insurer, Great American Insurance Company; (13) Bar-B-Que King, Inc. and/or BK Industries, Inc. and its insurer, Hartford Insurance Company; (14) W.H. Reynolds Distributors, Inc., B & L Distributors, and Northbrook Property and Casualty Insurance Company; (15) Imperial Associated Contractors, Inc.; (16) Nussetex Company and/or Nussex Company, Inc.; and (17) Lester Boudreaux, d/b/a Boudreaux Electric.
Most of the defendants subsequently filed cross-claims against most or all of the other defendants. A few of the named defendants were never properly joined or were found to be bankrupt and/or out of business. The various law suits were consolidated by the Court, and the trial of the matter was bifurcated into a liability phase and a damage phase.
The matter was tried for seven days commencing on December 1, 1987. During the course of the trial, the judge heard the testimony of twenty-two (22) witnesses and permitted the introduction of dozens of exhibits. At the conclusion of the trial, the judge took the matter under advisement and subsequently determined that the fire began in the National store in the area between the drop ceiling of the deli area and the floor of the storage room located directly above the deli. The judge also determined that a preponderance of the evidence supported the conclusion that the fire was the result of an electrical arc caused by a short in the control wiring in the deli oven. The trial judge concluded that National was solely liable for such damage resulting from the fire.[1]
Thereafter, the trial judge rendered judgment in favor of plaintiffs and against National Tea Company, Great Southwest Fire Insurance Company, and Twin City Fire Insurance Company on the main demand and dismissed all remaining demands, including third party demands, incidental demands, and cross-claims. From this adverse judgment, various parties appealed raising the following issues:
1. The trial court erred in dismissing the demands for the defective design or construction of the mall against the mall owners;
2. The trial court erred in dismissing the demands against the manufacturer and distributor of the oven under both strict liability and failure to warn theories;
3. The trial court erred in failing to find that the lease between National and the mall owners contained a release relieving National from liability for the fire; and
4. The trial court erred in refusing to permit a witness to testify as an expert witness.

*71 EXPERT WITNESS
Great Southwest Insurance Company (Great Southwest), National's insurer, contends that the trial court erred in refusing to permit William Esquinance to testify as an expert witness. Great Southwest urges that Esquinance was not permitted to testify, not because of any deficiency in his qualifications, but because he had not submitted a written report prior to the cut-off date set by the trial judge. Great Southwest reasons that the testimony of Esquinance, if he had been permitted to testify as an expert witness, would reveal that the factual finding that the fire departments and their employees were not negligent was manifestly erroneous.
LSA-C.C.P. art. 1631 provides, in pertinent part, as follows:
A. The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.
It is well settled that the trial judge has great discretion in the manner in which proceedings are conducted before his court, and it is only upon a showing of a gross abuse of discretion that appellate courts have intervened. Sullivan v. Welch, 328 So.2d 731 (La.App. 3rd Cir. 1976). Additionally, the trial court has great discretion in determining whether to qualify a witness as an expert, and such discretion will not be disturbed on appeal unless shown to be manifestly erroneous. Brown v. Morgan, 449 So.2d 606 (La.App. 1st Cir.1984).
In the instant case, the trial judge, attempting to streamline a very complex case involving over eighteen separate suits against more that seventeen defendants and numerous incidental demands, third party demands, and cross claims, established deadlines for pleadings, discovery, and other matters. Specifically, in a pretrial order, the trial judge ordered that "all reports from expert witnesses upon which deposition or trial testimony will rely" must be furnished to all counsel of record by September 17, 1986. Although Esquinance, who was one of the fire fighters who helped extinguish the fires at the mall in 1984, was deposed in March, 1986, prior to the deadline, some of the parties alleged, and the trial judge agreed, that the parties had not anticipated that Esquinance would testify as an expert witness until shortly before trial. He did not submit a written report as required by the trial judge's order within the deadline.
The trial judge is given great discretion in the manner in which the proceedings before him are conducted so that trials may proceed more orderly and expeditiously. This is even more important in a voluminous and complicated proceeding as in the instant case. We have carefully reviewed the entire record and cannot say that the trial judge grossly abused his discretion.
Additionally, LSA-C.C.P. art. 1636 provides, in pertinent part, as follows:
When a court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.
When the trial judge rules that the testimony of a witness is inadmissible, a proffer (offer of proof) can be made. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La.1985). It is incumbent upon the party who contends that his evidence was improperly excluded to make a proffer. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d at 340. Without a proffer, appellate courts have no way of ascertaining the nature of the excluded testimony. Joseph v. Mid-American Indemnity Co., 532 So.2d 347 (La.App. 3rd Cir.1988). In the absence of a proffer, that party cannot complain that the exclusion of the testimony was error. Joseph v. Mid-American Indemnity Co., 532 So.2d at 348; Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d at 340.
In the instant case, Great Southwest proffered only the deposition testimony of Esquinance, which from our review, does not explain the nature of the testimony *72 allegedly excluded. In his deposition, Esquinance did not render an opinion that the fire departments or any fire department employee was negligent in the performance of the fire-fighting duties on the day of the fires at the mall. He merely deposed that he may have done a few things differently. Considering all of the evidence of record, including the proffered deposition of Esquinance, we cannot say that the trial judge erred in excluding the testimony of Esquinance as an expert witness.

CAUSE OF FIRE
In the instant case, two theories, pyrolysis and electrical arc, were advanced relative to the deli oven being a cause of the fires. The majority of the attention at the trial focused on the existence of an electrical arc, allegedly caused by the deterioration of the insulation connecting the oven to another electrical device, called the peak load limiter.
The peak load limiter, also referred to as the energy management system (EMS), was installed by National during renovations, which added the deli area to the National store. The EMS sought to limit National's electrical usage to a preset maximum level. When National's electric usage approached its limit, the EMS would cut power to various electrical appliances in the store, reducing the electrical load.
The oven and the EMS were connected by wiring that ran from the junction box on the lower right front panel of the oven to the top of the oven into the drop ceiling of the deli. In this area, the wiring ran within a flexible metal conduit. It then ran along the wooden joists in the ceiling to the EMS.
In discussing the electrical arc theory the trial judge, in his written reasons for judgment stated:
Whenever the oven was in regular use, the temperature inside the column containing the peak load limiter wiring was well in excess of the rated maximum for the wirings' insulation. Over the course of several years of the oven's regular operation, this heat caused the insulation covering the wire both inside the column and immediately above the oven to break down. The deterioration of the insulation eventually reached a point where bare wire was exposed to the metal interior of the flex conduit. On the morning of the fire, an electrical arc formed at the point where the bare wire actually came into direct contact with the conduit. The electrical surge created by the arc travelled back toward the power source, up and along the EMT [electric metallic tubing] toward the peak load limiter. At some point as the wiring ran along the wooden joist above the oven, the surge created by the arc literally burst through the EMT. Sparks from the surge then ignited the wooden joist and started the fire.
After summarizing the testimony of the witnesses upon which this finding was based, the trial judge determined that the fire was caused by an electrical arc in the control wiring of the deli oven.
The Louisiana Supreme Court has repeatedly held that the factual findings by a trial court are entitled to great deference, and this court should not disturb them on appeal in the absence of manifest error. Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990); Rosell v. Esco, 549 So.2d 840 (La.1989). A careful review of the entire record reveals that the record amply supports the factual findings made by the trial judge. Accordingly, we find that the trial judge was not manifestly erroneous in finding that the fire was caused by an electrical arc in the control wiring of the deli oven.
Having determined that the fire was caused by an electrical arc in the control wiring of the deli oven, we must determine who is liable.

LIABILITY OF THE OVEN MANUFACTURER AND SELLER
Appellants contend that the trial court erred in not finding the manufacturer and/or distributor of the oven liable for the damages. Appellants reason that the manufacturer and/or distributor manufactured *73 and/or distributed a defective product and should be liable for the damages caused by their product.
Although the Louisiana Legislature recently enacted the Louisiana Products Liability Act, LSA-R.S. 9:2800.51, et seq., the cause of action giving rise for damages in the instant case occurred in 1984, prior to the effective date of this legislation. Therefore, this act is inapplicable to the instant case.
1. Manufacturer's Liability in Strict Products Liability.
In Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 at 113 (La. 1986), the Louisiana Supreme Court set forth the law regarding products liability cases, as follows:
There is general agreement upon the most basic principles of strict tort products liability. In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981); Hunt v. City Stores, 387 So.2d 585 (La.1980); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754 (1971).
A product can be determined to be unreasonably dangerous to normal use in several ways pertinent to the issues raised herein:
a. Unreasonably dangerous in construction or composition.

A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer, it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be. Halphen v. Johns-Manville Sales Corporation, 484 So.2d at 114. A manufacturer who sells a product with a construction or composition flaw is subject to liability without proof that there was any negligence on its part in creating or failing to discover the flaw.
b. Unreasonably dangerous because of its design.

A product may be unreasonably dangerous because of its design for one of the following reasons: (1) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product; (2) although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or (3) although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. Halphen v. Johns-Manville Sales Corporation, 484 So.2d at 115; Shipley v. Recreation and Park Commission for the Parish of East Baton Rouge, 558 So.2d 1279 (La.App. 1st Cir.), writ denied, 565 So.2d 947 (La.1990).
c. Unreasonably dangerous by its failure to warn.

A product may also be unreasonably dangerous when the manufacturer fails to warn the consumer of dangers inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen v. Johns-Manville Sales Corporation, 484 So.2d at 115; Shipley v. Recreation and Park Commission for the Parish of East Baton Rouge, 558 So.2d at 1285. An essential element of a cause of action based on the failure to adequately warn of a product's danger is that there must be a reasonable relationship between the omission of the manufacturer and the injury. *74 Bloxom v. Bloxom, 512 So.2d 839 (La. 1987). However, the manufacturer is not required to warn of obvious dangers, and there is no duty to warn "sophisticated users" of the dangers, which they may be presumed to know about because of their familiarity with the product. Duncan v. Louisiana Power & Light Company, 532 So.2d 968 (La.App. 5th Cir.1988). Further, the manufacturer need not prove that the sophisticated user had actual knowledge of the danger; it is sufficient that the manufacturer prove that the user should have known of the danger. Ducote v. Liberty Mutual Insurance Company, 451 So.2d 1211 (La.App. 4th Cir.), writ denied, 457 So.2d 15 (La.1984).
In a products liability case, whether a product is defective is a question of fact and the determination by the trier of fact will not be disturbed on appeal absent manifest error. Lirette v. State Farm Insurance Company, 563 So.2d at 852; Rosell v. Esco, 549 So.2d at 844.
Although the trial judge determined that an electrical arc in the control wiring of the deli oven caused the fire, he determined that the manufacturer was not liable for the resulting damages. As noted by the trial judge, "no serious allegations were ever made relative to the basic design or operation of the oven itself, at least apart from the mere presence of the right channel and its susceptibility to having wiring run through it." The manufacturer's alleged culpability was predicated upon its failure to warn of potential hazards associated with running wiring through the side channels, which the trial judge found did not require a warning from the manufacturer. We find no error in the trial court determination that the manufacturer was not liable.
2. Non-Manufacturer's (Seller/Distributor) Liability in Strict Products Liability.
Tort liability for a defective product attaches to a nonmanufacturer seller, who does not vouch for the product by holding it out as his own or who is not a professional vendor, only if he knew or should have known that the product was defective and failed to declare it. Nelton v. Astro-Lounger Manufacturing Company, Inc., 542 So.2d 128 (La.App. 1st Cir. 1989); Harris v. Atlanta Stove Works, Inc., 428 So.2d 1040 (La.App. 1st Cir.), writ denied, 434 So.2d 1106 (La.1983). Further, a non-manufacturer seller is not required to inspect the product prior to sale to determine the possibility of inherent vices or defects. Nelton v. Astro-Lounger Manufacturing Company, 542 So.2d at 131; Harris v. Atlanta Stove Works, Inc., 428 So.2d at 1043. However, a non-manufacturer, who holds the product out to the public as its own may have the same responsibility as that of a manufacturer. Williams v. Airport Appliance & Floor Covering, Inc., 445 So.2d 764 (La.App. 2d Cir.), writs denied, 447 So.2d 1070, 1071 (La.1984).
Furthermore, a manufacturer or seller cannot be liable in a products liability action where it proves that it did not manufacture, install, or sell the component part alleged to be defective. See Newman v. General Motors Corp., 524 So.2d 207 (La. App. 4th Cir.1988).
In the instant case, while the trial judge determined that an electrical arc in the control wiring of the deli oven caused the fire, he also determined that the seller was not liable for the resulting damages. The trial judge determined that the wire connecting the deli oven to the peak load limiter was defective in that it created an unreasonable risk of harm and that this defective condition was caused by National's installation of the wiring.
The trial judge found that, because none of the distributor's literature or specifications, which accompanied the oven, included any information about the peak load limiter, the EMS was not essential to the operation of the deli oven. Accordingly, the trial judge viewed the EMS as a modification of the oven.
After carefully reviewing all the evidence in the instant case, under the appropriate standard, we cannot say that the trial judge erred in finding that National *75 was a sophisticated user and made a modification to the oven. The trial judge correctly determined that, as such, the distributor was not liable for the damages caused by the defect nor was it obligated to warn of the potential damages.

LIABILITY OF MALL OWNERS
Appellants contend that the trial court erred in refusing to hold the mall owners liable for the defective design or construction of the mall. In support of this position, appellants reason that the trial court erroneously determined that the mall was constructed in compliance with the safety and building codes in existence at the time of its construction. Appellants also contend that the trial court erred in disregarding the responsibilities placed on building owners and lessors under the provisions of the Louisiana Civil Code.
1. Violation of Safety and Building Codes.
Generally, a violation of safety statutes constitutes civil negligence, but is actionable only when it is shown that the failure to follow a statute was a legal cause of the accident. Martyniuk v. DL-Mud, Inc., 526 So.2d 846 (La.App. 1st Cir.), writ denied, 531 So.2d 276 (La.1988); Robinson v. Allstate Insurance Company, 424 So.2d 322 (La.App. 1st Cir.1982), writ denied, 430 So.2d 76 (La.1983).
In the instant case, the provision of the safety code allegedly violated by the mall owners is LSA-R.S. 40:1612, which provided as follows:[2]
The following specific requirements apply to all retail stores:
....
(3) All buildings having an aggregate gross area of all floors, including basements, used for department store purposes, of more than twenty-five thousand square feet shall be completely protected by an automatic sprinkler system. Where a building is divided by fire walls into two or more sections, each such section may be considered as a separate building for the purpose of this requirement.
At the time the instant cause of action arose, LSA-R.S. 40:1578.6 also provided that all newly constructed structures and movables must comply with the rules and regulations promulgated by the fire marshal, in conformity with the Administrative Procedures Act, but this statute expressly exempted existing buildings which were constructed and maintained in compliance with the rules and regulations in effect at the time of the construction.[3]
2. Liability Under Civil Code.
Appellants contend that the mall owners are also liable for failure to install fire stops and/or automatic sprinkler systems in the mall under LSA-C.C. arts. 2316, 2317, 2322, and 2695.
a. Liability under LSA-C.C. arts. 2315 and 2316.
LSA-C.C. art. 2315 provides, in pertinent part, as follows:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
LSA-C.C. art. 2316 provides as follows:
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
Under these articles, the elements of a cause of action in negligence are fault, causation, and damage. Buckley v. Exxon Corporation, 390 So.2d 512 (La.1980); Williams v. Exxon Corporation, 541 So.2d 910 (La.App. 1st Cir.), writ denied, 542 So.2d 1379 (La.1989).
Appellants argue that the mall owners lacked the requisite prudence and skill in designing and constructing the mall as evidenced by the failure to install fire stops and/or automatic sprinkler systems. Appellants *76 argue that the more prudent avenue for the mall owners to have taken was to install these devices, even if the building codes did not compel their installation. Appellants reason that the mall owners' failure to do so constitutes negligence, making them liable for the resulting damages.
b. Liability under LSA-C.C. art. 2317.
LSA-C.C. art. 2317 provides in pertinent part, as follows:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
An injured party seeking damages under article 2317 need not prove negligence, that is, that any particular act or omission on the part of the defendant caused the injuries. He must only prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect, that is, that it occasioned an unreasonable risk of injury to another, and that the injury was caused by the defect. Crowell v. City of Alexandria, 558 So.2d 216 (La. 1990); Riche v. City of Baton Rouge, 515 So.2d 765 (La.1987). Once these elements are proven, the custodian can escape liability only by showing that the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Crowell v. City of Alexandria, 558 So.2d at 218; Riche v. City of Baton Rouge, 515 So.2d at 768.
c. Liability under LSA-C.C. art. 2322.
LSA-C.C. art. 2322 provides as follows:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.
Appellants argue that the mall owners' failure to incorporate fire stops, automatic sprinklers, and/or fire alarms constitutes a "ruin" in that it is a vice in the original construction or it is a "neglect to repair" the mall after its original construction. Appellants reason that the mall owners are strictly liable for these failures.
In Fonseca v. Marlin Marine Corporation, 410 So.2d 674 at 679 (La.1981), the Louisiana Supreme Court noted that:
The party who seeks damages under article 2322 must prove that his injury was caused by the ruin of a building owned by the defendant, and that the ruin was attributable to a vice in the building's original construction or to a failure to repair it.
The only difference between the negligent liability of LSA-C.C. arts. 2315 and 2316 and the strict liability of LSA-C.C. arts. 2317 and 2322 is the element of proof of the defendant's scienter. In negligent liability, the plaintiff must show that the defendant either knew of should have known of the defect, whereas under strict liability, the plaintiff is relieved of proving this element. Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982); Williams v. Exxon Corporation, 541 So.2d at 913.
The trial judge determined that the evidence failed to establish that the mall owners were liable based upon the design of the mall. The trial judge determined that the design and construction the mall was in compliance with all codes in effect at the times of the original construction and the renovation of the National store. The trial judge specifically determined that the mall constituted four separate structures for the purposes of determining applicability of the codes. Additionally, the trial judge did not find that any vice, defect, or ruin of the mall existed. Instead, the trial judge determined that a defect in the wiring of the oven caused the fire.
We have carefully reviewed the entire record, under the applicable standards of review, and find that the trial judge correctly determined that the mall owners were not liable for the damages resulting from the fire under LSA-C.C. arts. 2315, 2316, 2317, or 2322.
d. Liability under LSA-C.C. art. 2695.
LSA-C.C. art. 2695 provides as follows:

*77 The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same, (emphasis added)
This article governs the lessor's liability to the lessee for damages caused by vices and defects and places on the landlord the primary obligation to keep the premises in repair. Ivey v. Housing Authority of Mansfield, 514 So.2d 661 (La.App. 2d Cir. 1987). In order for a lessee to recover damages from the lessor under this article due to an alleged vice or defect in the leased premises, the lessee must prove by a preponderance of the evidence that a defect existed in the premises and that the defect caused the damages. Green v. Hodges Stock Yard, Inc., 552 So.2d 435 (La.App. 4th Cir.1989).
Proof by direct or circumstantial evidence is sufficient to constitute a preponderance if, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Green v. Hodges Stock Yard, Inc., 552 So.2d at 439. Causation may be proved by circumstantial evidence, and that evidence need not negate all possible other causes, but it must exclude other reasonable hypotheses with a fair amount of certainty. Buxton v. Allstate Insurance Company, 434 So.2d 605 (La.App. 3rd Cir. 1983).
In the instant case, the trial judge determined that the fire was caused as a result of the defective wiring in the National oven and that National was at fault in creating such defective condition. Accordingly, the fire was not caused by a defect in the leased premises themselves, but by the defective equipment in the possession of one of the lessees. As such, the provisions of LSA-C.C. art. 2695 are inapplicable. Additionally, with regard to Great Southwest's contention, LSA-C.C. art. 2695 is only applicable to lessees who are not at fault. Since Great Southwest's insured, National, was the lessee determined to have caused the fire, Great Southwest could not avail itself of the protection of this article.

LEASE PROVISIONS
Appellants contend that the trial court erred in finding that Vigilant could recover the damages to the leased premises from National and Great Southwest. Appellants reason that, under the provisions of the lease between the mall owners (Vigilant's insureds) and National, National was released from any liability for the leased premises arising out of a fire, regardless of the cause. Therefore, the issue presented is the correct interpretation of the lease agreement.
In Sovereign Insurance Company v. Texas Pipe Line Company, 488 So.2d 982, 984 (La.1986), the Louisiana Supreme Court set forth the rules for contract interpretation as follows:
Interpretation of a contract is the determination of the common intent of the parties. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include. When the parties intend a contract to have a general scope, but particularly describe a specific situation to eliminate doubt, the interpretation of the contract must not restrict its scope to that specific situation. The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity, or custom, is considered as incidental to the particular contract, or necessary to carry it into effect. Equity is based on the *78 principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another, (citations omitted) (footnotes omitted).
In the instant case, the lease provision at issue[4] addressed the possibility of fire and provided as follows:
ELEVENTH: ....
The Lessor hereby covenants and agrees to carry replacement insurance in limits sufficient to rebuild total development including demised premises and does hereby release and discharge the Lessee, its agents, successors and assigns from any and all claims and damages whatsoever from any cause resulting from or arising out of any fire or other casualty on the herein demised premises or on said total development or any part thereof.
National contends that the aforementioned provision operated as a release from any liability for fire damage and that such provision is insufficient to provide for indemnification as to the claims of third parties. Great Southwest contends that the aforementioned language does not constitute an indemnity agreement and that the trial court erred in applying the law of indemnity in the instant case.
In the instant case, the trial judge determined that the lease did not contain an indemnification clause. We agree. In interpreting the lease provision at issue, we find that the clear and unambiguous language in that provision required the lessor (the mall owners) to carry insurance and replace the leased premises in the event of a fire. The lease, however, does not address the allocation of liability between the lessor, the lessee, other tenants, and/or a third party tort-feasor. Instead, the provision merely outlines the responsibilities to obtain insurance and reconstruct the mall; nothing more, nothing less. It does not appear that the parties intended to allocate liability for a fire caused by the lessee. Further, the lease clearly does not provide that the lessor and/or its insurer is to hold harmless and/or indemnify the lessee from its own intentional acts, acts of negligence, or strict liability. If the parties had so contemplated such an agreement, they could have provided for it with an indemnification clause, which could have provided with specificity that the lessor was obligated to indemnify the lessee from the lessee's own negligent acts or any damages resulting from the lessee's strict liability.[5]

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed in all respects. National and Great Southwest are cast for all costs on appeal.
AFFIRMED.
SHORTESS, J., concurs in part, dissents in part with reasons.
SHORTESS, Judge, dissenting in part, concurring in part.
I agree with the majority except for its treatment of the claim between Vigilant (lessors' insurer) and National (lessee). The majority finds that the lease agreement does not address the allocations of liability between the lessor and lessee but instead "merely outlines the responsibilities to obtain insurance and reconstruct the mall; nothing more, nothing less." However, the lease agreement plainly calls for lessor to carry insurance against loss by fire and specifically provides that lessor "does hereby release and discharge the Lessee, its agents, successors and assigns *79 from any all claims and damages whatsoever from any cause resulting from or arising out of any fire or other casualty on the herein demised premises ..." (emphasis added).[1] Courts have barred subrogated insurers from recovery under similar provisions under the theory that the parties entered into a valid assumption of risk/release clause; or that the parties intended the lessee to be treated as an insured under the required fire policy and that the subrogated insurer does not have the right to subrogation against its own insured. Cf. Peninsular Fire Ins. Co. v. Louisiana Debating & Literary Assn., 385 So.2d 510 (La.App. 4th Cir.), and Peninsular, 385 So.2d at 513 (Lemmon J., concurring), writ refused, 393 So.2d 742 (La.1980) (where the parties agreed that lessee would insure the premises and that the lessor would not be liable for any damage occurring to the leasehold improvements which, like in this case, accrue to the benefit of the lessor at the termination of the lease).
Assuming the validity of a number of cases which apply the law of indemnity in this type factual situation, Vigilant should still be barred from recovery. The trial court in its reasons for judgment only relied on statutes and cases that impose strict liability on the tort-feasor. Although Vigilant argues that some of the trial court's statements could be construed as finding National negligent in the alternative, this interpretation requires stretching the trial court's reasons for judgment far beyond the obvious. In Soverign Ins. Co. v. Texas Pipe Line Co., 488 So.2d 982 (La.1986), the Louisiana Supreme Court held there is no requirement that courts presume parties did not intend to agree to indemnify the indemnitee's strict liability when the agreement does not expressly cover the situation. Instead, when the provisions are doubtful or silent in this regard, the court may "interpret the contract on this point in light of everything that, by law, custom, usages or equity is considered as incidental or necessary to its effectuation." Soverign, 488 So.2d at 983.
The plain language of this agreement indicates the parties contemplated and allocated, as between themselves, the possibility of claims based on strict liability for damage caused by fire originating in National's store, the fact that lessor agreed to provide coverage was not accidental, but was clearly bargained for during the drafting of the lease agreement. No one appears to seriously suggest that one side had an unfair bargaining advantage over the other. Nor has anyone articulated how an agreement like this violates public policy. I don't believe the lessor can grant to Vigilant rights that it contracted away.
Moreover, even assuming that National was also negligent in the installation of the "peak load limiter" to the oven, magic words that the lessee will be indemnified against his own "negligence" are not required. Polozola v. Garlock, Inc., 343 So.2d 1000 (La.1977). The cases cited by the parties appear to have a common thread: the broader the language of the indemnity agreement, the less likely will be a finding that the parties intended to indemnify the indemnitee against his own negligent acts. See, e.g., Jayco Sales and Service, Inc. v. L.D. Smith, 303 So.2d 554 (La.App. 1st Cir.1974). Here, in contrast, the lease agreement only addresses loss caused by fire or similar cause. Considering the provision of the agreement that specifically relieves lessee from returning the property at the end of the lease in good condition when damage is caused by fire along with the provision set forth above, I am convinced that the parties expressed an unequivocal intent that as between themselves the lessor agreed to hold the lessee harmless for damage caused by fire regardless of his fault.
Additionally, courts have stated that because of the obligor's lack of ability to evaluate, predict, or control the risk which may be created by the indemnitee's future *80 conduct, enforcement of such a provision without clear evidence that the risk was bargained for and accepted may allow one to take unfair advantage of another and unjustly enrich himself at the other's expense. Moreover, such an injustice may encourage antisocial acts and a relaxation of vigilance toward the rights of others by relieving the wrongdoer of liability for his conduct. Soverign, 488 So.2d at 986. However, the lease provision in question is narrowly tailored to include only damage by fire and other similar cause. Here, the lessor did not need to evaluate or predict the riskit purchased insurance from Vigilant for that purpose. Finally, under the facts presented, upholding the contract will not promote a lack of vigilance on National's part. As between the parties themselves, I see no reason to strictly construe the agreement when the policies behind strict construction are not promoted.
In light of the lease agreement's plain language, the lessor is powerless to grant to Vigilant rights that it has contracted away. Accordingly, I respectfully dissent from this portion of the opinion.
NOTES
[1] National and its insurers have not appealed that portion of the trial court judgment finding National at fault in causing the fire. On appeal they contend that the trial court erred in not finding other parties liable for the fire.
[2] By Acts 1978, No. 567, § 1, this provision was repealed. However, it was in full force and effect at the time the mall was constructed.
[3] However, if the fire marshal deems that a serious life hazard exists due to the particular condition, the exemption is inapplicable. See LSA-R.S. 40:1578.6.
[4] Paragraph 4 of the lease addressed repairs and provided as follows:

At expiration of said term, Lessee will quit and surrender the premises hereby demised in as good state and condition as received, reasonable wear and tear incident to Lessee's business and damage by fire or the elements, or from other causes beyond its control excepted.
[5] In fact, in a rider, dated August 25, 1976, the lease was amended with regard to liability from the common area and parking lot. The rider contained the following language:

Lessor agrees to indemnify and hold Lessee harmless for any and all claims for injury to or death of persons and/or damage to property arising out of the use of said parking or common areas.
[1] The lease also provides that "[a]t expiration of said term, Lessee will quit and surrender the premises hereby demised in as good state and condition as received, reasonable wear and tear incident to Lessee's business and damage by fire or the elements, or from other causes beyond its control excepted."