349 So.2d 494 (1977)
Mrs. Audrey OWENS
v.
NEW ORLEANS BUILDING MAINTENANCE, INC., et al.
No. 8190.
Court of Appeal of Louisiana, Fourth Circuit.
August 1, 1977.
Rehearing Denied September 8, 1977.
*496 Jones, Walker, Waechter, Poitevent, Carrere & Denegre (Patrick W. Browne, Jr. and Timothy T. Roniger, New Orleans), for defendants-appellants New Orleans Building Maintenance, Inc. and Lillian Johnson.
John J. McCann and Herman M. Schroeder, New Orleans, for plaintiff-appellee.
Before LEMMON, BOUTALL and SCHOTT, Judge.
SCHOTT, Judge.
Defendants, New Orleans Building Maintenance, Inc. (NOBM), and Lillian Johnson, have appealed from a judgment in favor of plaintiff for $228,020.13 and in favor of intervenor, Maryland Casualty Company, for $28,279.94, plus future compensation benefits payable to plaintiff. Plaintiff answered the appeal seeking an increase in general damages.
On May 31,1972, the 46 year old plaintiff was employed as a night auditor at the Royal Sonesta Hotel in New Orleans. At about 1:00 A.M. she had been working on the hotel's restaurant receipts in the front office and, when they would not balance, she took them to a larger rear office where she could spread out these receipts and check closely for the error in the figures. She sat down at a desk a few steps across the room from the door through which she had entered.
Defendant Johnson was an employee of NOBM, which provided janitorial and custodial service for the hotel. When plaintiff entered the back office Johnson had been mopping the floor which was made of tile, perhaps vinyl. She had completed mopping around the desk plaintiff used before plaintiff entered the room. At the time plaintiff seated herself the mopping continued to plaintiff's left in an aisle and then continued in back and to the right of plaintiff when the area around the door was mopped. Plaintiff found the error in the receipts for which she was searching, gathered them up, and as she had almost reached the door to return to the front office she slipped and fell in a seated position with her legs in a V shape, dropping the receipts on the floor. By this time Johnson had left the area around this door and had moved across the room to mop *497 around another door. Upon hitting the floor plaintiff felt pain immediately and experienced an involuntary bowel movement. She went to the restroom to clean herself and there became nauseated and vomited. Shortly thereafter she left work and went home. Later that morning, during business hours, she spoke to the hotel manager who instructed her to go to the Baptist Hospital for an examination. This hospital visit was the beginning of a long series of hospitalizations, medical treatment and surgery.
At the Baptist Hospital she complained of pain in the low back. The examiner found tenderness in the sacrum. X-rays of the area were negative and a preliminary diagnosis of lumbosacral strain was made.
On June 2 plaintiff was examined by Dr. Donald De Loach, a general surgeon. He diagnosed a lumbosacral contusion and prescribed muscle relaxant and heating pad.
On June 14 and 26 plaintiff was examined by Dr. James Corcoran, a general surgeon. She complained of headaches and pain in her coccygeal area. Dr. Corcoran found that her coccyx had been pushed forward from trauma and was tender. He recommended that plaintiff be seen by a neurologist for an evaluation.
Plaintiff went to Dr. Evan Howell, a neurologist, on July 25, but in the meantime sought emergency medical treatment at the East Jefferson Hospital on July 19, and Ochsner Foundation Hospital on July 24. On the July 19 visit to East Jefferson, the history taken from plaintiff was to the effect that she had fallen at work and fractured her tail bone and was having headaches since then. The examiner described the headache as a throbbing right post cervical and occipital headache. Medication was prescribed and there is a note on the hospital report by Dr. John D. Jackson to the effect that plaintiff had an appointment to see him on July 26.
The record of plaintiff's July 24 visit to Ochsner Foundation Hospital includes two physicians' report, containing the following pertinent items: She had been well until a fall at her office on May 31 and she suffered nausea, headaches and lumbosacral sprain since then. The day before this visit she fell down at her home striking her forehead and hematoma was found on her forehead. She had an appointment to see a neurologist on the following morning.
When Dr. Howell saw plaintiff on July 25 he took a history from plaintiff which included the following: Since the time of the injury she had severe throbbing headaches beginning in the back of her neck and radiating into the vertex region of her head. These were aggravated by walking. She also had occasional headaches consisting of severe sharp pain running from one temple to the other. She had experienced at least eight episodes where she got weak, staggered and lost consciousness. She complained of blurring vision. Dr. Howell conducted a full neurological examination and had X-rays taken. Because of the history she gave of the trauma, particularly the involuntarily bowel movement she had at the time, sphincter changes he found, and changes found on the X-rays, he recommended a myelogram. Plaintiff was hospitalized for this purpose on July 26 at East Jefferson Hospital. The myelogram indicated the possibility of disc disease in the lumbosacral spine and definite disc material extruding in the cervical spine. Cervical spondylolysis and a definite traumatic injury to the cervical spine were diagnosed and plaintiff was referred to Dr. Jackson, the neurosurgeon for continued treatment at the hospital.
Dr. Jackson recommended removal of the discs between C-4 and C-7. This was accomplished on August 7 by entrance into the neck from the front and the area was fused. On August 22 she was discharged, wearing a cervical collar which was to be worn from six to eight weeks. When Dr. Jackson next examined plaintiff on October 2 she was still having pain in the neck and shoulders and was told to continue with the cervical collar. From the myelogram Dr. Jackson was also convinced of the necessity for surgery on plaintiff's lumbosacral spine but preferred to postpone this until plaintiff recovered from the cervical surgery.
*498 On March 18, 1973, Dr. Jackson again admitted plaintiff to East Jefferson Hospital for a laminectomy. Parts of the discs between L-4 and S-1 were removed. She was discharged from the hospital on April 1.
Thereafter, plaintiff continued to suffer pain in the right buttocks and right lower extremity, necessitating frequent prescriptions for drugs. She became depressed, leading Dr. Jackson to refer her to a psychiatrist. Her continued pain in the lumbar spine led Dr. Jackson to recommend a rhizodomy which involved the placing of needles into the joints and the destruction of the spine nerves going to the joints. This was accomplished at Lakeside Hospital on March 13, 1974, in the area between L-3 and S-1, and she was discharged from the hospital on March 16. Because of plaintiff's complaints of pain, Dr. Jackson referred her to Dr. Courtney Russo, an orthopedic surgeon.
Dr. Russo examined plaintiff on April 10 and diagnosed a ruptured intervertebral disc. He recommended a "radical" procedure which would include a fusion and would require plaintiff to be placed in a body cast extending from the breast to the knees for about three months. Plaintiff was admitted to East Jefferson Hospital for this purpose on May 12, and was discharged from the hospital in the cast on June 4.
On August 2 plaintiff was admitted to the Baptist Hospital for removal of the cast, physical therapy and the fitting of a brace, which extended from the shoulder blades to the buttocks. She was discharged on August 26. A walker was prescribed for ambulation. By March, 1975, she was able to walk without the back brace.
Dr. Russo testified that plaintiff would never obtain complete relief from pain and would have permanent problems. In response to the question as to whether she would be a good candidate for a job involving prolonged sitting or standing, Dr. Russo said "I wouldn't think any eight hour a day job, possibly part time but not full time." He also stated that she was still having nerve root complaints as of May, 1975, and might require further surgery. In the meantime she had seen, on April 1, 1975, Dr. Kenneth Vogel, a neurologic surgeon.
On April 1, 1975, Dr. Kenneth Vogel, a neurologic surgeon, examined plaintiff. He too concluded that further surgery on the nerve roots would be required and recommended that she see Dr. Donald Richardson for this purpose.
Dr. Richardson did not testify at the trial, but Dr. Don Fontenelle, a clinical psychologist, testified that he saw plaintiff on June 3, 1975, at Dr. Richardson's request for the purpose of determining whether plaintiff's pain was real or psychosomatic. On the basis of his tests he reported to Dr. Richardson that there was no evidence of severe emotional disturbance. Plaintiff's pain was not psychosomatic but was organically induced and therefore she was a good candidate for neurosurgery.
At the trial on June 23 and July 28,1975, plaintiff testified: She was still under medication and had pain in her leg, right hip, and lower back. She was unable to take the exercises prescribed by Drs. Jackson and Russo, and on their advice tried walking. Walking just one city block caused great pain. She saw Dr. Richardson once and another operation was discussed, but she was unwilling to undergo it. She has never been free of pain since May 31, 1972, and has discontinued her social life.
The trial judge itemized his award as follows:

Personal injury $60,000.00
Medical and hospital expenses,
present and future 20,308.13
Loss of wages to date of filing
suit 21,649.00
Loss of future wages 96,063.00
Future mental pain, anguish and
suffering 30,000.00

In his reasons for judgment, the trial judge stated that he considered plaintiff's injuries to be serious, that these injuries were the result of a fall on the floor caused by a wet substance negligently left there by defendant Johnson, that plaintiff was still disabled at the time of the trial and would probably be disabled for the rest of her life.
*499 Defendants specify errors in the trial court's finding any negligence on the part of defendant Johnson, failing to find contributory negligence on the part of plaintiff and making excessive awards for general damages and loss of future wages.
THE NEGLIGENCE OF DEFENDANTS
Defendants contend that they should be exonerated from liability on the basis of the duty risk formula of tort liability as set forth in the Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972) and Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962). Under this formula the initial question is that of the causal connection between the act or omission of the defendant and the resulting injury to plaintiff. The next question is whether there is a duty on the part of the defendant to protect plaintiff from the type of harm suffered and, finally, if such a duty is found to exist whether the defendant violated that duty.
Defendants' first argument against liability is that the conduct of defendant Johnson did not cause the injuries suffered by plaintiff. In support thereof, they rely on the record of plaintiff's visit to the emergency room at Ochsner Clinic on July 24, showing that she suffered a second slip and fall at her home.
This report cannot be isolated from the record but must be considered with the other evidence. Plaintiff told Dr. Howell on the day after her Ochsner visit that she had eight episodes of loss of consciousness since the date of the accident. She also testified that she was in perfectly good health before this accident. The trial judge apparently found that she was credible and we accept his credibility call. Furthermore, five days before she went to Ochsner plaintiff sought emergency treatment at the East Jefferson General Hospital with the complaint of throbbing, cervical and occipital headache. When this evidence is taken together it seems more probable than not that plaintiff's ultimate disability was caused by the accident of March 31, 1972, and not by the fall she sustained on July 24. It is also probable, based on Dr. Howell's history, that the fall of July 24 itself was the result of the accident of March 31. In any event, we are not in a position to disturb the factual conclusion of the trial judge that these injuries all resulted from the accident since it is based on reasonable credibility evaluations and factual inferences. Canter v. Koehring, 283 So.2d 716 (La. 1973).
More difficult to answer is defendants' argument that Lillian Johnson owed no duty to plaintiff to protect her from the particular harm which she suffered in this particular case. Their argument follows:
". . . The owner or operator of a premises is obligated only to keep a premises free from hidden dangers, traps, or pitfalls which are not known to an invitee which would not be observed by the invitee in the exercise of reasonable care. The court is aware that this is the highest standard of care owed to anyone who comes on the premises of another, and this is the duty, if any, which the janitress owed to Audrey Owens. This is not to say, however, that the janitress had a duty to warn Audrey Owens of known or obvious risks. Audrey Owens knew that the floor was mopped every night. She knew that the floor was being wet mopped on the very night she slipped and fell. She knew that a recently mopped floor may be difficult to walk on at times. She knew that people sometimes slip and fall on recently mopped floors. Slipping and falling is perfectly logical, obvious, normal and ordinary risk which one assumes if one wishes to walk on a floor which one knows to have been recently mopped. It is not an unknown danger, trap, or pitfall."
In support of their argument defendants rely on Rachal v. Brookshire Grocery Stores, Inc., 336 So.2d 1014 (La.App. 3rd Cir. 1976); Vegh v. Kaiser Aluminum and Chemical Corp., 259 So.2d 850 (La.App. 1st Cir. 1972); Kuhn v. Oulliber, 225 So.2d 317 (La.App. 4th Cir. 1969); Newell v. Zurich *500 Insurance Co., 325 So.2d 745 (La.App. 1st Cir. 1976) and other cases which they say illustrate that defendant Johnson did not owe a duty to plaintiff to warn her of the obvious danger of walking on a recently mopped floor.
Before addressing ourselves to these cases and the legal theory relied upon by defendants, it is noted that they take issue with the basic fact finding of the trial judge that this area of the floor was wet or damp when plaintiff slipped. Defendant Johnson insisted that the floor was dry at the time of plaintiff's fall, but plaintiff testified that some of the receipts which she dropped on the floor stuck to it because of the floor's dampness. The trial judge concluded that the floor was wet and there would be no basis for us to conclude differently with respect to this factual determination.
The cases cited by defendants are distinguishable in that in each of these cases the object or condition which caused the plaintiff to slip was indeed obvious, whereas in our case the wetness of the floor was not necessarily obvious to plaintiff under the circumstances. In Rachal plaintiff knowingly walked across an expanse of floor where a janitor was cleaning up a spill of oil and she slipped but did not fall just prior to the time she did fall. In Newell, plaintiff was running in the rain on pavement with bare feet and the court found that this is a universally known hazard which the defendant had no duty to warn against. In Vegh plaintiff was intimately familiar with the slippery quality of bauxite mud and knowingly stepped into it, falling shortly thereafter. It is significant also that in each one of these cases plaintiff lost in the trial court and the judgment was affirmed by the appellate court so that factual findings of the trial judge were not being reversed in each case as defendants are asking us to do in the instant case. In the Kuhn case, this court did reverse the trial court which had found the defendant liable but there was a crucial distinction in the facts of that case.
In the Kuhn case plaintiff tripped over a board placed over a doorway to confine a small dog. This court observed that the board across the door was within the view of the guests for a considerable period of time before plaintiff fell over the board. Furthermore, the plaintiff admitted that she knew the defendant, who was her sister, had used the board in that manner on other occasions in the house and she visited her sister about once a month. This is in sharp contrast to the facts and circumstances of the instant case.
It is significant that defendant Johnson insisted that the floor was dry at the time of plaintiff's fall. From the facts as found by the trial judge we now understand that the floor was wet, so that Lillian Johnson's testimony can best be understood in the context that she thought it might have been dry because of the time intervening between her mopping and the time of plaintiff's fall, but it turned out that she was wrong in this assumption. If Lillian Johnson thought the floor was dry by then how can it be said by defendants that plaintiff should have known the floor was wet? Also the clear water placed on this floor was not so obvious a hazard as was the board in the Kuhn case. It was more in the nature of a hidden trap under these circumstances. Furthermore, when plaintiff entered the room the area around the door where she fell had not yet been mopped. This occurred after plaintiff sat down facing away from the door and was intent on finding an error. By the time she found the error and got up Lillian Johnson was on the other side of the room. It does not necessarily follow under these circumstances that plaintiff should have known the floor was wet. Finally, the question of whether this was an obvious danger or one that should have been known to plaintiff under the circumstances is primarily a question of fact. There is sufficient evidence in the record to show that this was the type of danger which Johnson had a duty to warn plaintiff about when she knew or should have known, that plaintiff had been engrossed in her work at the desk.

*501 PLAINTIFF'S CONTRIBUTORY NEGLIGENCE
From the foregoing discussion it follows that the evidence does not preponderate in favor of defendants on their plea of contributory negligence. After plaintiff found her error she started across the short expanse of floor to the door, expecting that floor to be in the same condition it was in when she entered the room. Lillian Johnson was not mopping that area at that time but had done so some undetermined time while plaintiff was busy searching for the error, and Johnson was now on the other side of the room. We cannot charge plaintiff with contributory negligence for not realizing the floor was still damp when Lillian Johnson herself thought it was no longer damp. We cannot say that the trial judge erred in rejecting defendants' affirmative defense of contributory negligence under these circumstances.

QUANTUM
In effect, the trial judge awarded plaintiff $90,000 for her damages, notwithstanding that he itemized $60,000 for "personal injury" and $30,000 for "future mental pain, anguish, and suffering." In this opinion we have meticulously outlined the course of medical treatment to which this plaintiff was subjected over the three year period between the date of the accident and the time of trial, and the uncontradicted medical evidence is to the effect that she has a permanent injury and will suffer pain indefinitely. We cannot say that the trial judge abused his discretion, especially considering the case of Coco v. Winston Industries, 341 So.2d 332 (La.1977).
Defendants have taken issue with the award to plaintiff for loss of future income in the amount of $96,063. Plaintiff, in her brief, contends that this award was inadequate in that it did not include a "cost of living" increase in such future wages.
The evidence on loss of future earnings consisted of the testimony of W. E. Groves, a consulting actuary. He testified that he estimated plaintiff's work-life expectancy to be 21.3 years from the date of the trial and her life expectancy to he 28.6 years. He based this estimate on tables prepared by the U.S. Department of Health, Education and Welfare. Using an average wage of $7106 as the base together with a 4½% discount he computed the present value of her loss of future earnings to be $96,063. He also used a 2% cost of living increase per year, discounting it to the present date at 4½% to arrive at an additional $18,451. The trial court did not award plaintiff the latter figure.
Defendants take issue with the actuary's estimate of work-life expectancy, contending that plaintiff at age 50 could not reasonably be expected to work until age 71. They would have us accept a report by the U.S. Department of Labor which fixes a 50 year old plaintiff's work-life expectancy at 15.6 years, and would have us compute her future earnings on the basis of the $7106 gross income for 15.6 years, using an investment rate of 7.5% and omitting any adjustment for the increase in the cost of living to arrive at future lost wages in the amount of $68,892.
The publication referred to by defendants was not placed in evidence but is only referred to in their brief, so that it is not properly before us. Furthermore, no expert witness was produced by defendants to substantiate their approach to computation of lost future earnings. On appeal we can say only that the trial judge arrived at a figure which finds support from the testimony of the only expert who appeared. Furthermore, the trial judge apparently counterbalanced any differential in the number of years of life expectancy by his refusal to allow any cost of living increase to be included in the figures, and in so doing we cannot say that his discretion was abused.
Accordingly, the judgment appealed from is affirmed.
AFFIRMED.