United States Court of Appeals,

Fifth Circuit.

No. 92-3511.

Cynthia Ann KELLEY, Individually and on Behalf of Her Minor Children Jerred Seth Kelley and Cindy Lynn Kelley, Plaintiff-Appellant Cross-Appellee,

v.

PRICE-MACEMON, INC., et al., Defendants,

Industrial Refrigerated Systems, Inc., Defendant-Appellee Cross-Appellant.

June 15, 1993.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before KING and EMILIO M. GARZA, Circuit Judges, and COBB[*], District Judge.

KING, Circuit Judge:

After the tragic death of her husband in an ice-plant accident, Cynthia A. Kelley brought this products liability action against Industrial Refrigerated Systems, Inc., and other parties involved in the manufacture, installation, and sale of the ice plant. All named defendants except Industrial ultimately were dismissed from the action, and the case was tried to a jury, which returned a verdict in favor of Industrial. On Kelley's motion, however, the district court ordered a new trial on the sole issue of Industrial's liability as the seller of the plant. Industrial subsequently filed a motion seeking summary judgment on this same issue, which the district court granted.

Kelley now appeals, arguing that the district court erred in granting summary judgment. On cross-appeal, Industrial contends that the district court should never have ordered the new trial. After a careful review of the record, we conclude that the district court properly granted Industrial's motion for summary judgment. We therefore affirm the judgment of the district court, and we need not reach the question of whether the district court erred in granting the new trial.

I.

In January 1987, Industrial Refrigerated Systems, Inc., ("Industrial") contracted with Delton

[*]District Judge of the Eastern District of Texas, sitting by designation.

Demere to provide the equipment for an ice plant, which was to be assembled in Leeville, Louisiana, along Bayou Lafourche. The plant was designed to provide a fully automated, or "pushbutton," system for delivering ice for sale to local fishermen, shrimpers, and seafood companies. Its primary components were: (1) a commercial ice-making machine; (2) a large refrigerated storage bin or silo, in which bulk ice would be stored; and (3) an automated delivery system, which would move the ice out of the storage bin.

The delivery system consisted of a "sweep" auger—large rotating screws which pivoted around a gearbox in the center of the storage bin's steel floor, sweeping the floor and pulling the ice into a chute—and a conveyor belt, which then transported the ice out to the point of sale. On the side of the storage bin were four small service doors, which provided access to the inside of the bin. The system's control panel was located outside of the bin, near one of the service doors.

Pursuant to the contract, Industrial arranged for the delivery of the plant's component parts to the job site, while Demere built the foundation and made arrangements for the installation of the components. Price-Macemon, Inc., the manufacturer of the storage bin and auger, provided a factory representative to supervise the installation. By late May, the ice plant was fully installed and ready for operation. Prior to commencing commercial operations, however, Damas Demere, Delton's brother and the general manager of the ice plant, held a start-up meeting, at which time he, David Easley, the installation contractor, and representatives of Industrial conducted a walk-through of the plant. During this walk-through, the participants entered the ice storage bin to "work out" some problems with the auger and, while inside, saw the auger "mutilate" a metal shovel.[1] The participants later offered differing versions of the incident: Demere stated that Easley was holding the shovel, and the auger "pulled it out of his hand"; Easley stated that he "threw it in there" as a "demonstration."

From its first day of operation, the ice plant had problems. Apparently because the storage bin was inadequately insulated, a layer of ice at the top of the bin often would freeze or "clump" up while the ice-maker was not actually in production. When this clump of ice reached the bottom of

---

[1]Screw augers are most commonly used to move grain. Apparently to facilitate the movement of ice, as opposed to grain, the leading edge of the auger, which is generally straight and smooth, had been modified by the addition of teeth to chop or grab the ice as it rotated.

the bin, the auger would not grab the ice and move it to the chute. Instead, the ice would "bridge," or stay on top of the auger, which then would push the ice around the floor of the bin. The result was a complete interruption in the delivery of the ice. Efforts to change the consistency of the ice produced by the ice-maker failed to remedy the problem. Consequently, it occasionally became necessary for an ice-plant employee to climb into the storage bin to break up the ice clump with a pick or a shovel. In order to clear the ice from the bin as quickly as possible, plant employees developed the unfortunate practice of climbing into the bin while the auger was running, chopping the ice, and feeding it into the auger.

On the morning of July 5, 1987, Steve Fillimich, an ice-plant employee, turned on the delivery system, climbed into the storage bin, and began breaking up the approximately eighteen inches of ice that lay on the floor of the storage bin. When a second employee, Jack Kelley, arrived for work, he took over the ice-chopping duties inside the bin while Fillimich went outside to feed the ice into a truck. After several minutes, Fillimich noticed that the ice had stopped coming out of the bin. When Fillimich investigated, he discovered that Jack Kelley, who somehow had become entangled in the auger, was dead.

In July 1988, Cynthia Kelley filed this diversity action on behalf of herself and her two minor children, seeking damages arising from her husband's death. In her complaint, Kelley named as defendants eleven parties, including Industrial, allegedly involved in the manufacture, installation, and sale of the ice plant.[2] Prior to trial, however, Kelley's claims against all defendants except Industrial were dismissed.[3]

---

[2]In addition to Industrial, Kelley's complaint named as defendants: Price-Macemon, Inc., the manufacturer of the storage bin and auger; Rochester Silo, Price-Macemon's successor in interest; Turbo Refrigeration Company, Inc., the manufacturer of the ice-making machine; Delton's One-Stop, Inc. and Demere Seafood, Inc., Jack Kelley's employers; Demere's Ice Company, Inc., the owner of the ice plant; Boyd Refrigeration, the installer of the ice plant; Bollinger Machine Shop & Shipyard, Inc., the entity that cut the steel floor for the storage bin; and Moore Refrigeration, an entity which apparently had no connection whatsoever to the case.

[3]Kelley's claims against the other defendants were dismissed for a variety of reasons. Price-Macemon, for example, was voluntarily dismissed as a party because it had ceased to exist, and Rochester Silo, Price-Macemon's successor in interest, had already been named as a defendant. The district court later severed Kelley's claims against Rochester Silo when it filed for bankruptcy. Kelley's attorney apparently never sought to lift the automatic stay imposed by the bankruptcy

Kelley's claims against Industrial were tried before a jury in early October 1991. Kelley pursued two theories of liability. She argued primarily that Industrial, as the "manufacturer" of the ice plant, was strictly liable for her husband's death. Alternatively, she argued that, even if Industrial were found not to be the manufacturer of the plant, it nonetheless would be liable as the *seller* of the plant for its failure to warn of a dangerous condition. The jury returned a verdict in favor of Industrial, and the district court entered a judgment in accordance with the jury's verdict on October 11, 1991.

Kelley timely moved for a judgment notwithstanding the verdict or, alternatively, for a new trial. Concluding that "reasonable and fair-minded" jurors could have reached the same verdict, the district court denied Kelley's request for judgment notwithstanding the verdict. The court nevertheless granted Kelley's motion for a new trial on the sole issue of Industrial's liability as the *seller* of the ice plant.[4]

Thereafter, on April 10, 1992, Industrial filed a motion for summary judgment. In its motion, Industrial asserted that it was entitled to judgment as a matter of law because the summary judgment evidence demonstrated that it did not have knowledge of any defects or dangerous conditions in the ice plant and, alternatively, that it had no duty to warn of the auger's obvious danger. The motion was set for hearing on April 29. Thus, under Uniform Louisiana Local Rule 2.07E, Kelley was required to file her response to the motion for summary judgment on April 21, or eight calendar days prior to the hearing date.

Industrial's motion for summary judgment arrived at the office of Kelley's attorney, Henry L. Klein, on Monday, April 13. Mr. Klein, however, was out of town during the entire week of April

---

filing or otherwise pursue his client's claims against the manufacturer in the bankruptcy proceedings. Interestingly, the record reflects that Rochester Silo agreed to reimburse *Demere* for the purchase price of the bin and auger system because it was "real hard to sell ice [from the machine] after the accident."

[4]Industrial unsuccessfully sought appellate review of the district court's order granting Kelley's motion for a new trial. It first requested the district court to certify the order for permissive appeal under 28 U.S.C. § 1292(b), but the district court refused to do so. It then sought review of the district court's new trial order by a petition for mandamus with this court. The petition for mandamus, however, was denied.

13 on a "combination vacation/brief-writing" trip. He allegedly did not discover the motion until late Tuesday, April 21. At that time, Mr. Klein contacted opposing counsel to request an extension of time in which to file his response, and he was informed that Industrial would not oppose an extension. Significantly, Mr. Klein failed to contact the district court on April 21 to request an extension.

The district court, having received no response from Kelley on April 21, reviewed Industrial's motion for summary judgment without the benefit of opposition. It found the motion to have merit and therefore granted summary judgment in favor of Industrial. A judgment to that effect was entered by the district court on April 22. Thus, when Mr. Klein finally contacted the district court on April 24, he discovered that his client's action against Industrial had been dismissed.

Four days later, on April 28, Mr. Klein filed a motion for reconsideration and a short memorandum in opposition to Industrial's motion for summary judgment. In the motion for reconsideration, Klein argued that Kelley was entitled to relief from judgment under Rule 60(b)(1) of the Federal Rules of Civil Procedure on the grounds of inadvertence or excusable neglect.[5] The district court disagreed, but, "in an abundance of caution," reconsidered Industrial's motion for summary judgment "on the merits with the benefit of plaintiff's opposition." After considering Industrial's motion in light of Kelley's response, the district court concluded that, although a fact issue did exist with respect to Industrial's knowledge of the auger's dangerousness, Industrial nevertheless was entitled to summary judgment because the auger in which Kelley had become entangled presented an obvious danger against which Industrial had no duty to warn. Accordingly, the district court refused to grant Kelley relief from the April 22 judgment.

Both parties filed timely notices of appeal. Kelley appeals from the district court's grant of summary judgment in favor of Industrial and from the district court's order refusing to grant relief

---

[5]Mr. Klein explained that he "was veritably immersed" in meeting a briefing deadline in another matter, "which resulted in the inadvertent failure to notice that certain motions had been filed" in Kelley's case. Moreover, according to Klein, he would have filed an unopposed motion for extension of time with the district court on April 23 but for the murder of a close friend and neighbor on April 22.

from that judgment.[6]  Industrial cross-appeals from the district court's November 13, 1991, order granting a new trial.

## II.

Kelley argues on appeal that the district court erred in granting Industrial's motion for summary judgment and in refusing to grant her motion for relief from that judgment.  Specifically, Kelley asserts, at least in her brief to this court, that the district court improperly granted Industrial's motion as "unopposed" because of her attorney's failure to file a timely response.  Yet, as we have noted, *supra,* the record clearly discloses that the district court ultimately did address the merits of Industrial's motion and, in so doing, considered the "hastily-drafted" response offered by Kelley's attorney.  Indeed, Kelley conceded this point at oral argument.  Consequently, we need not address Kelley's specific argument that Industrial's motion was improperly granted as "unopposed."  Moreover, because Kelley's concession also forecloses her argument that the district court erred in refusing to grant her motion for relief from judgment, Kelley's appeal presents only one question:  whether the district court properly granted summary judgment in favor of Industrial on the issue of its liability as the seller of the Demere ice plant.[7]  Because we answer that question in the affirmative, we need not address Industrial's argument on cross-appeal that the district court erred in granting the new trial.

---

[6]Because Kelley's "Motion for Reconsideration" may properly be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment, Kelley's appeal from the denial of that motion may also be considered as a timely appeal from the underlying order granting Industrial's "unopposed" motion for summary judgment.  *See Cobb v. Miller,* 818 F.2d 1227 (5th Cir.1987) (motion to alter or amend judgment under Rule 59(e) makes judgment nonfinal for purposes of appeal);  FED.R.APP.P. 4(a) (timely motion under Rule 59(e) tolls the running of time for filing a notice of appeal).

[7]Kelley also raises a number of issues regarding the manner in which the trial court should proceed in the event of a remand.  Specifically, Kelley argues that we should instruct the trial court to exclude all evidence of victim fault and third-party liability.  Kelley also contends that, on remand, she should be entitled to judgment as a matter of law on the issues of "strict seller liability" and "inadequacy of warning."  As Kelley acknowledges in her brief, however, these issues are not "directly" presented by her appeal of the district court's grant of summary judgment or its denial of her motion to reconsider.  Kelley has not appealed from the district court's denial of her motion for a judgment n.o.v., and that court's order granting the new trial has rendered harmless any error committed during the first trial.  Kelley, in effect, asks this court to render an advisory opinion on these issues.  Because we conclude that a remand for trial is not warranted, we clearly need not address these issues.

## A.

In our review of the district court's grant of summary judgment, we examine the record *de novo. Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988). Summary judgment is proper only if the record discloses that there is no genuine issue as to any material fact and that Industrial is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In examining the record, we must view the evidence and all justifiable inferences drawn from that evidence in the light most favorable to Kelley. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2501, 2513-14, 91 L.Ed.2d 202 (1986); *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986). If the record, viewed in this light, could not lead a rational trier of fact to find for Kelley, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 578, 106 S.Ct. 1348, 1351, 89 L.Ed.2d 538 (1986); *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990). If, on the other hand, the factfinder could reasonably find in Kelley's favor, then summary judgment is improper. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; *Lavespere,* 910 F.2d at 178.

In the context of summary judgment, the rules governing burden of proof are critically important. *Lavespere,* 910 F.2d at 178. As the moving party, Industrial bears the initial burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986); *Lavespere,* 910 F.2d at 178. Industrial must sustain this burden by informing the court of the basis for its motion, and by identifying portions of the record which reveal that there are no genuine issues for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552-53; *Lavespere,* 910 F.2d at 178. Once such a showing is made, however, the burden shifts to Kelley to set out specific facts in the record showing that a genuine issue exists. *Lavespere,* 910 F.2d at 178.

## B.

Under Louisiana law,[8] the manufacturer of a defective product—that is, a product that is

---

[8]We note that Mr. Kelley's accident occurred prior to the effective date of the Louisiana Products Liability Act, LA.REV.STAT.ANN. § 9:2800.51 *et seq.* (West 1991).

unreasonably dangerous to normal use—may be held strictly liable in tort for harm caused by the product. *See Halphen v. Johns-Manville Sales Corp.,* 484 So.2d 110, 113 (La.1986); *Bell v. Jet Wheel Blast,* 462 So.2d 166, 168 (La.1985); *Hebert v. Brazzel,* 403 So.2d 1242, 1244 (La.1981); *Weber v. Fidelity & Casualty Ins. Co.,* 259 La. 599, 250 So.2d 754 (1971). The non-manufacturer seller of a product, by contrast, generally may be held liable only for its negligent failure to warn consumers of the dangerous propensities of the product it sells. *See Hopper v. Crown,* 555 So.2d 46, 48 (La.Ct.App. 1st Cir.1989) ("A non-manufacturer/seller in some instances has a duty to warn a purchaser of defects and/or dangerous propensities in the products he sells."), *rev'd on other grounds,* 558 So.2d 1117 (La.1990).[9]

It is well-settled, for example, that the seller of a defective product may be liable in tort if he knew or should have known that the product was defective, and he failed to declare it. *Home Ins. Co. v. National Tea Co.,* 577 So.2d 65, 74 (La.Ct.App. 1st Cir.1990), *aff'd in part, rev'd in part on*

---

[9]There are, of course, exceptions to the general rule. For example, a non-manufacturer seller who holds a product out to the public as his own, or who qualifies as a "professional vendor," may be held to the same standard as a manufacturer. *See Chappuis v. Sears Roebuck & Co.,* 358 So.2d 926, 930 (La.1978); *Home Ins. Co. v. National Tea Co.,* 577 So.2d 65, 74 (La.Ct.App. 1st Cir.1990), *aff'd in part, rev'd in part on other grounds,* 588 So.2d 361 (La.1991); *Nelton v. Astro-Lounger Mfg. Co.,* 542 So.2d 128, 132 (La.Ct.App. 1st Cir.1989). Because Kelley does not seek recovery under either of these two theories, we need not concern ourselves with the details.

Kelley has argued, however, both at trial and before this court, that a non-manufacturer seller is subject to strict liability under § 402A of the Restatement (Second) of Torts. As the district court noted, however, Kelley has offered no Louisiana cases supporting her argument that strict products liability applies to non-manufacturer sellers. Moreover, Kelley's assertion at oral argument that the Louisiana Supreme Court's decision in *Bell v. Jet Wheel Blast,* 462 So.2d 166 (La.1985), supports her position is simply untenable. In that case, the Louisiana court addressed a narrow question certified by this court: whether the defense of contributory negligence applied to strict products liability claims under Louisiana law. *Id.* at 168. And, while some of the language of the decision might be read to suggest that "suppliers" could be subject to strict liability, *see id.,* the court clearly did not purport to address the issue of strict "seller" liability. Indeed, in the wake of *Jet Wheel Blast,* Louisiana courts have consistently stated that sellers of defective products are accountable only for their negligent failure to warn. *See Home Ins.,* 577 So.2d at 74; *Nelton,* 542 So.2d at 131; *LeBleu v. Homelite Div. of Textron, Inc.,* 509 So.2d 563, 565 (La.Ct.App. 3rd Cir.1987). Finally, it is noteworthy that in enacting the Louisiana Products Liability Act, LA.REV.STAT.ANN. § 9:2800.51 *et seq.* (West 1991), which became effective September 1, 1988, the Louisiana legislature imposed strict liability only upon manufacturers and those sellers that would have qualified as "professional vendors" under prior case law. *See id.* at § 2800.53(1)(b) (definition of manufacturer).

*other grounds,* 588 So.2d 361 (La.1991); *Nelton v. Astro-Lounger Mfg. Co.,* 542 So.2d 128, 131 (La.Ct.App. 1st Cir.1989); *LeBleu v. Homelite Div. of Textron, Inc.,* 509 So.2d 563, 565 (La.Ct.App. 3rd Cir.1987); *Harris v. Atlanta Stove Works, Inc.,* 428 So.2d 1040, 1043 (La.Ct.App. 1st Cir.). *See also* LA.CIV.CODE ANN. art. 2545 (Liability of seller for concealment of vice). Moreover, even in the absence of a defect *per se,* some Louisiana courts have imposed upon the seller of a potentially dangerous product a duty to warn of the possible dangers involved in using that product. *Hopper,* 555 So.2d at 49; *American Ins. Co. v. Duo Fast Dixie, Inc.,* 367 So.2d 415, 417 (La.Ct.App. 4th Cir.1979); *Hoffoss v. Ralston Purina Co.,* 341 So.2d 605, 606 (La.Ct.App. 2nd Cir.1977); *Williams v. Allied Chemical Corp.,* 270 So.2d 157, 160 (La.Ct.App. 1st Cir.1972). A seller is not required, however, to inspect a product prior to sale to determine the possibility of inherent vices or defects which are not apparent. *Home Ins.,* 577 So.2d at 74; *Nelton,* 542 So.2d at 131; *Harris,* 428 So.2d at 1043. And, unlike the manufacturer, the seller is not presumed to have knowledge of a product's vices. *Hopper,* 555 So.2d at 48; *Martin v. Henderson,* 505 So.2d 192, 195 (La.Ct.App. 3rd Cir.1987); *see also Weber v. Fidelity & Casualty Ins. Co.,* 259 La. 599, 250 So.2d 754 (La.1971).[10] Furthermore, Louisiana courts have consistently held that a seller's duty to warn goes only to those dangers which are not obvious—the seller has no duty to warn of dangers of which the user is or should be aware. *Delanzo v. ABC Corp.,* 572 So.2d 648, 651 (La.Ct.App. 5th Cir.1990); *Hopper,* 555 So.2d at 49; *American,* 367 So.2d at 417; *see also Halphen,* 484 So.2d at 155 (limiting the duty of a *manufacturer* to warn to dangers which are not within the knowledge

---

[10]Industrial argues in its brief that it had no independent duty to warn of the dangers presented by the auger-equipped bin because the manufacturer, Price-Macemon, provided no warnings. According to Industrial, the failure of the manufacturer to provide sufficient warnings "serves to absolve" the seller of any liability for damages. Industrial cites *Delanzo v. ABC Corp.,* 572 So.2d 648, 651 (La.Ct.App. 5th Cir.1990) and *Elmwood Plantation, Inc. v. Ruud Water Heater Div.,* 435 So.2d 507 (La.Ct.App. 5th Cir.1983), in support of this proposition. In each of these cases, however, the court found that the seller had no independent duty to warn *because* there was no evidence that the seller knew or should have known of the defect that caused the injury. *See Delanzo,* 572 So.2d at 651; *Elmwood,* 435 So.2d at 512-13. If the manufacturers had furnished warnings, the sellers presumably would have had knowledge of the defect, or, at the very least, they would have been negligent in not forwarding the warnings to the consumer. Thus, these cases do not stand for the broad proposition asserted by Industrial. Rather, they merely apply the well-settled rule that a seller's duty to warn goes only to those defects or dangers of which it is or should be aware.

of or obvious to the user); *Home Ins.,* 577 So.2d at 73-74 (same); *LeBleu,* 509 So.2d at 565 (same); *Ducote v. Liberty Mut. Ins. Co.,* 451 So.2d 1211, 1213 (La.Ct.App. 4th Cir.1984) (same); *Lovell v. Earl Grissmer Co.,* 422 So.2d 1344, 1350 (La.Ct.App. 1st Cir.1982) (same); *Thornhill v. Black, Sivalls & Bryson, Inc.,* 385 So.2d 336, 338 (La.Ct.App. 1st Cir.1980) (same), *aff'd,* 394 So.2d 1189 (La.1981).[11]

In the case before us, Industrial moved for summary judgment on the issue of its liability as the seller of the auger-equipped ice bin on the grounds that it had no knowledge of any defect or dangerous condition prior to Jack Kelley's accident and, alternatively, that it had no duty to warn of an obvious danger. In support of its first argument, Industrial offered the affidavit of David McGowan, Industrial's president, in which he states that "[Industrial] had no knowledge of any alleged defects in any of the equipment, and [Industrial] was never aware of any alleged dangerous or unsafe condition in the equipment at any time prior to the accident involving Mr. Kelley."

---

[11]We note that effective August 1, 1980, Louisiana adopted a pure comparative fault system of tort liability. *See* LA.CIV.CODE ANN. art. 2323 (West Supp.1993). The Louisiana Supreme Court, in response to a question certified by this court, has stated that the statute serves to eliminate "the inequities inherent in the "all or nothing' recovery rules that prevailed prior to the adoption of comparative fault." *Murray v. Ramada Inns, Inc.,* 521 So.2d 1123, 1133 (La.1988). Specifically, the Louisiana court held that the defenses of contributory negligence and assumption of the risk "shall no longer operate as a complete bar to recovery" in negligence or strict liability cases. *Id.* Thus, according to the Louisiana Supreme Court, the "net effect of article 2323, as amended, is to prevent courts from applying any defense more injurious to a damage claim than comparative negligence." *Bell v. Jet Wheel Blast,* 462 So.2d 166, 170 (La.1985). The *Murray* court also expressly rejected the argument that the defendant "had *no duty* to protect the decedent from a danger of which he had knowledge" as an attempt to "inject" the assumption of the risk doctrine into the analysis "through the back door." 521 So.2d at 1136 (emphasis in original). Although the tension between Louisiana's new pure comparative fault system and the "obvious danger rule" is clear, to date, no Louisiana court has directly addressed the issue. Indeed, in cases decided after the effective date of article 2323, Louisiana courts have continued to recite the rule without comment. *See Delanzo,* 572 So.2d at 651; *Hopper,* 555 So.2d at 49; *see also Halphen,* 484 So.2d at 155 (limiting the duty of a *manufacturer* to warn to dangers which are not within the knowledge of or obvious to the user); *Home Ins.,* 577 So.2d at 73-74 (same); *LeBleu,* 509 So.2d at 565 (same); *Ducote,* 451 So.2d at 1213 (same); *Lovell v. Earl Grissmer Co.,* 422 So.2d at 1350 (same). In, *Hopper,* the only case actually decided on the issue of the obviousness of the danger, the Louisiana Supreme Court reversed without reasons. *See Hopper v. Crown,* 558 So.2d 1117 (La.1990). In a concurring opinion, however, one Justice stated in dicta that "the seller might still prevail if the defect was obvious to the ordinary user." *Id.* (Lemmon, J., concurring). In light of the fact that the courts of Louisiana clearly have not rejected the obvious danger rule as inconsistent with comparative fault, and the fact that Kelley has not raised the issue, we need not decide how we think the Louisiana Supreme Court would resolve the issue if it were directly presented.

Industrial also offered excerpts from McGowan's trial testimony[12] in which he testified that he had no knowledge of any specific defect in the ice-storage bin. Specifically, he stated that he was not aware of the need for certain safety equipment and warning decals until after the accident.[13]

As Kelley pointed out in her response, however, McGowan's own testimony belies his assertion that he was not aware of "any allegedly dangerous or unsafe condition" in the auger-equipped bin prior to Jack Kelley's death. McGowan testified that he entered the bin on one occasion, along with Damas Demere, David Easley, and two others, for the purpose of "testing the movement of the augers and things like that" and that, while he was in the bin, he saw the auger "eat" a metal shovel. Demere described the incident as follows:

> [W]e had got into [the bin] to observe [the auger] running. There were some problems with the gearbox, problems with the sweep, and after we came out of that machine we expressed to anyone who would lend an ear "Do not get in the machine.' It's potentially lethal. We had seen what it would do that day. I believe David Easley was holding a shovel, and [the auger] pulled it out of his hand, and, you know, it was a revelation for us."

David Easley's version of the "shovel-eating" incident differs somewhat from Demere's, but the impact of the incident is no less apparent:

> Q. Were you—were you at the demonstration where Mr. McGowan and Mr. Olinde were where the auger caught a shovel?
>
> A. Yeah. I'm the one who threw it in there.

---

[12]In the usual case, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits submitted by the parties in support or in opposition to the motion constitute the summary judgment record. *See* FED.R.CIV.P. 56(c). In the instant case, however, the district court, in adjudicating Industrial's motion for summary judgment, primarily relied upon the testimony offered at the prior trial. Although Rule 56 does not expressly contemplate the use of such evidence in granting summary judgment, we find no error in relying upon such evidence. It is well-settled that a certified transcript of a judicial proceeding may be considered on a motion for summary judgment. *See Langston v. Johnson,* 478 F.2d 915, 918 (D.C.Cir.1973) (citing cases); *see also Randolph v. Laeisz,* 896 F.2d 964, 970 (5th Cir.1990) (considering—without discussion—the testimony given during the trial of the main action on a motion for summary judgment in a severed action); *Downes v. Beach,* 587 F.2d 469, 471-72 (10th Cir.1978) (holding that the record of the prior proceeding was properly considered on a motion for summary judgment after a new trial was granted). In the present case, a certified transcript of the prior trial was made part of the record.

[13]On October 29, 1987, nearly five months after Jack Kelley's fatal accident, Industrial received from Price-Macemon, the manufacturer of the ice bin and auger, a package containing interlock or "deadman" switches, warning decals, and instructions regarding the installation of the switches and the placement of the decals.

Q. You threw it in there. And why did you throw it in there?

A. As a good demonstration.

Q. And so it would chop it up and eat it up?

A. It mutilated it.

Q. And after it mutilated it [ ...] did this occur before Jack Kelley was killed?

A. Yes.

Q. And what steps did you take to see to it that the workers who worked in that area would work in a safe environment after that?

A. I told everybody that would listen, as I testified earlier, that this was—this was a piece of equipment that could kill you.

Q. And that's it?

A. I don't know what else I could have done.

. . . . .

Q. Did you tell McGowan that?

A. McGowan saw it.

Based on what he saw that day in the ice bin, McGowan testified: "I think it was quite obvious that the equipment is dangerous." We agree with the district court that this testimony precludes summary judgment in favor of Industrial on the issue of its knowledge of the dangerous condition presented by the auger-equipped bin.

The second theory offered in support of Industrial's summary judgment motion was that the auger-equipped bin presented a danger that was so obvious that Industrial had no duty to warn. As noted, *supra,* a seller's duty to warn goes only to those dangers which are not obvious—the seller has no duty to warn of dangers of which the user is or should be aware. *Hopper,* 555 So.2d at 49; *American,* 367 So.2d at 417. In support of this theory, Industrial primarily relied upon the testimony of Damas Demere. According to Industrial, Demere testified that he was well aware of the danger posed by the auger, that everyone knew the auger could kill, and that he had warned all of the ice-plant employees, including Jack Kelley, to stay out of the bin. Indeed, according to Industrial, Demere told Kelley that he was not even to get on the platform on which the bin was situated.

Industrial also stated generally that "Delton Demere, Steve Fillimich, David Easley, and David McGowan all testified that the potential danger of the auger was obvious." In granting summary judgment, the district court concluded that the testimony of these witnesses established that the auger in which Kelley had become entangled presented an obvious danger. After a careful review of the trial transcript, we agree, for, even when we view the testimony, as we must, in the light most favorable to Kelley, we conclude that it could not lead a rational trier of fact to find in favor of Kelley on the issue of the auger's obvious danger.

As Industrial pointed out in its motion for summary judgment, Damas Demere, David Easley, and David McGowan each testified that he knew the auger-equipped ice bin was a very dangerous piece of equipment. This acute sense of dangerousness arose, at least in part,[14] from the shared experience of being inside the bin and watching the auger mutilate a metal shovel. According to Damas Demere, once they "had seen what it could do," they knew that the auger was "potentially lethal."

Delton Demere, on the other hand, did not witness the "shovel-eating" incident and, apparently, never had been inside the bin. Not surprisingly, Delton was not as adamant about the dangerousness of auger-equipped bin as were Damas, Easley, and McGowan. He conceded on cross-examination, however, that he had stated in a deposition that "[n]obody would have had any business being in that ice machine." He also testified that he thought Jack Kelley had been in the bin prior to the day of his accident.

Steve Fillimich, Jack Kelley's co-worker and the only ice-plant employee who testified, explained the problem with the ice plant: "When the ice would settle at the bottom, if for a few days, it was hard to break. The auger would just eat in certain part, the top would not come down. It would just eat, and the ice would stay on top, so you had to go in there with a pick and break it, or a shovel." Fillimich testified that the only way to get the ice out of the bin was to go into the bin with

[14]Of course, as the seller and installer of the ice-bin, McGowan and Easley also possessed knowledge about the product that an ordinary user would not have, and, at least arguably, a certain self-interest. *See Elliott v. Group Medical & Surgical Serv.,* 714 F.2d 556, 564 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984) (self-serving testimony is subject to especially searching scrutiny).

the auger running, chop the ice, and feed it into the auger. He testified further that he had gone into the bin on at least two occasions to break up ice—he "figured" it "was part of his job"—and that other employees, including Jack Kelley, also had gone into the bin to chop ice, with the auger running, prior to the day of the accident.

Fillimich also stated that he knew that the auger, which swept the floor of the bin, presented a danger:

> Q. Okay. Now, when you were in there shoveling the ice, you knew you had to stay clear of that auger, didn't you?
>
> A. Yeah, common sense.
>
> Q. Common sense?
>
> A. Right.
>
> Q. Because you knew if you didn't stay clear of that auger what would happen?
>
> A. Very Dangerous.
>
> Q. Okay. Nobody needed to tell you that, did they?
>
> A. No.

According to Fillimich, he stayed clear of the auger by staying in front it, shoveling the ice, and moving back, always careful to watch the auger and keep his feet and shovel "clear."

Fillimich recounted that on the morning of the accident, he had turned on the delivery system, climbed into the ice bin, and started chopping ice. When Jack Kelley arrived for work that morning, Fillimich testified, "he took the shovel and he want in and I came out." According to Fillimich, he then went out to "run the ice into a truck." Precisely what happened inside the bin remains a mystery.

While it is not clear from the record that anyone ever told Jack Kelley to stay out of the auger-equipped bin,[15] the uncontroverted testimony of Fillimich and Delton Demere establishes that

---

[15]Both Damas Demere and David Easley testified that they had told "everybody who would listen" to stay out of the ice bin. Easley, after some equivocation, testified that he was "sure" he told Kelley. Demere testified that "Jack [Kelley] was present more than once when I told several people never to go inside that storage bin," that it was his "policy" that no employees were to go into the bin, and that he told Jack Kelley that he would be fired if he got "on the slab" again. Yet Demere also testified that, prior to Kelley's accident, he was not "aware" that employees were going into the bin and that "there was no set policy as far as saying don't get in." He also admitted that his warning to Kelley regarding getting on the "slab" had nothing to do with going

Jack Kelley had been in that bin, chopping ice and feeding it into the auger, prior to the day he was tragically killed. Thus, on the morning of July 5, 1987, when Jack Kelley climbed through the small service door on the ice bin, he knew what was inside. And, while he had not witnessed the shovel-eating incident as had Damas Demere, Easley, and McGowan, he nonetheless "had seen what it could do."

The question of whether Jack Kelley actually knew of the danger presented by the auger-equipped bin is, of course, a question of fact. Similarly, under Louisiana law, the question of whether the danger presented by the auger-equipped bin was obvious—that is, whether it presented a danger that should have been known to Jack Kelley under the circumstances is also primarily a question of fact. *Owens v. New Orleans Maintenance, Inc.,* 349 So.2d 494, 500 (La.Ct.App. 4th Cir.1977). Nevertheless, in light of the uncontroverted evidence that those who observed the auger in operation were aware of its potential danger, that Kelley had been in the ice bin before, with the auger running, and that the auger was running when Kelley climbed into the bin on July 5, 1987, we must conclude that the record before us, even when viewed in the light most favorable to Kelley, could not lead a rational trier of fact to find that Jack Kelley should not be charged with knowledge of the auger's dangerousness. Under these circumstances, an ordinary user should have recognized the danger. *See Melton v. Deere & Co.,* 887 F.2d 1241, 1244 (5th Cir.1989) (affirming a judgment n.o.v. and stating that "the risk that an auger may be engaged whenever the engine is running is a matter of common sense with which the a reasonable user of the combine must be charged"); *Gray v. Manitowoc Co.,* 771 F.2d 866, 871 (5th Cir.1985) (reversing and rendering judgment in favor of a manufacturer on grounds that a reasonable jury could not have found that a danger was not open and obvious). Thus, because the record before us does not disclose a genuine issue of fact regarding the obvious nature of the danger that lay inside the ice bin, we find that the district court properly granted summary judgment in favor of Industrial on the issue of its liability as the seller of the Demere

_____

inside the bin, but arose from his concern that Kelley would again break a piece of machinery on the underside of the bin. According to Fillimich, he was never told that he should not go into the bin to break up the ice. Moreover, he testified that he never told Jack Kelley not to go into the bin and that, to his knowledge, no one else had ever told Kelley to stay out. This testimony, at best, creates a fact issue.

ice plant.

## III.

In sum, we conclude that the record before us supports the district court's conclusion that the auger in which Jack Kelley became entangled on July 5, 1987, presented an obvious danger—that is, it presented a danger of which Kelley should have been aware. Thus, under Louisiana law, Industrial had no duty to warn of that danger. Because Industrial's tort liability as the *seller* of the ice-plant must arise, if at all, from its failure to warn of this dangerous condition, Industrial is entitled to judgment as matter of law. Accordingly, we AFFIRM the judgment of the district court.